UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

---

GARDABANI HOLDINGS B.V.,
    Strawinskylaan 901,
    Amsterdam, Netherlands 1077XX,

and

TELASI, JSC,
    Vani Street, No. 3,
    Tbilisi, Georgia, Didube District

        Petitioners,

    - against -

GEORGIA,
    7 Ingorokva Street,
    Tbilisi 0114, Georgia,

        Respondent.

Case No. 25-CV-1975

---

### PETITION TO RECOGNIZE AND ENFORCE AN SCC ARBITRATION AWARD

Petitioners Gardabani Holdings B.V. ("Gardabani") and Telasi, JSC ("Telasi") (collectively, "Petitioners"), by and through their attorneys, state as follows:

### INTRODUCTION

By this action, Petitioners by and through its undersigned attorneys, hereby bring this plenary action under Section 207 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 207, and the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330, U.N.T.S. 38 (the "New York Convention" or the "Convention") and its implementing legislation under Chapter 2 of the FAA, 9 U.S.C. § 201 et seq., for an order and judgment confirming, recognizing, and enforcing the final award dated

1

September 9, 2022 (the "SCC Final Award") in SCC Arbitration V2018/039, *Gardabani Holdings B.V., Inter RAO UES PJSC, and Telasi JSC v. Georgia*, (the "SCC Arbitration"), conducted with legal seat in Stockholm, Sweden,[1] pursuant to the 2010 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC").[2] In addition, Petitioners seek an order enforcing the pecuniary obligations imposed by the SCC Final Award by an entry of judgment in Petitioners' favor and against Georgia in the full amount of the SCC Final Award, including interest and costs as provided therein and with further interest to accrue pursuant to the SCC Final Award until the date of payment in full, in addition to the costs of this proceeding.

A true and correct copy of the SCC Final Award is attached as Exhibit A to the Declaration of Amir H. Toossi in support of Petitioners' Petition to Recognize and Enforce an SCC Arbitration Award ("Toossi Declaration" or "Toossi Decl."), dated May 16, 2025.[1]

## PRELIMINARY STATEMENT

1.      Petitioners seek the recognition and enforcement of an arbitral award rendered against Georgia resulting from Georgia's breaches of its tariff-setting agreements with Petitioners.

---

[1] The hearing in the SCC Arbitration was physically conducted in France.

[2] As discussed in more detail below, the SCC Arbitration was conducted in parallel with another arbitration before the International Centre for Settlement of Investment Disputes (the "ICSID Arbitration"). Because arbitrations were similar based on the subject matter and overlapping participants, the parties requested that the same arbitration panel (the "Tribunal") oversee both proceedings. While the Tribunal ultimately issued awards in both arbitrations, and there is overlap in the two awards, Petitioners only seek confirmation of the SCC Award in this action. Moreover, Gardabani and Silk Road Holdings filed a petition in this Court to recognize and enforce the ICSID Award. *See Gardabani Holdings B.V. v. Georgia*, 23-cv-00397-RJL. Petitioners have undertaken not to seek double recovery to the extent that the two awards overlap.

2. After the collapse of the Soviet Union in the 1990s, the Georgian electricity sector transitioned from a state-owned system to a liberalized system, and Georgia sought to rehabilitate its energy sector by attracting investment.

3. Petitioner Gardabani is an investor in Georgia's energy sector, owning electricity generation companies, JSC Khrami HPP-1 and JSC Khrami HPP-2, and an electricity distribution company, JSC Telasi.

4. Petitioners executed a series of tariff-setting agreements with Georgia over the course of roughly fifteen years. Georgia breached some of these agreements by imposing on the Petitioners a new tariff-setting methodology adopted in 2014, which ran contrary to the agreements with Petitioners and impaired Petitioner's investments in the Georgian energy sector.

5. On June 9, 2017, Petitioners initiated SCC arbitration proceedings against Georgia under the Rules of the Stockholm Chamber of Commerce ("SCC"), pursuant to the terms of the arbitration agreements contained in the Memorandum on the Development of Cooperation in the Electric Sector and the Implementation of Previous Agreements between the Government of Georgia, the Partnership Fund JSC (a Georgian state-owned entity), Inter RAO, Telasi, the Khrami HPP-1 JSC and Khrami HPP-2 JSC (together, the "Khrami Companies"), and Mtkvari Energy LLC (owned by Inter RAO) (the "2013 Memorandum") and a share purchase agreement between the Government of Georgia, the Ministry of Economy and Sustainable Development of Georgia, the State Service Bureau Ltd. and Gardabani Holdings B.V. (the "Khrami SPA").

6. On April 19, 2021, the Tribunal issued a Partial Award on Liability, finding that Georgia had, in fact, breached its agreements with Petitioners. Toossi Decl., Ex. B at ¶ 795. Then, on September 9, 2022, after proceedings to determine damages, the Tribunal issued a Final Award ordering that Georgia to pay damages in the amount of $27,499,000 (USD) to Gardabani

3

and $84,500,000 (USD) to Telasi. Toossi Decl., Ex. A at ¶ 88-89. The Tribunal also ordered Georgia to pay interest on the Award accruing from December 24, 2021 until the date of payment in full. *Id.* at ¶ 99.

7. Petitioners now seek this Court's recognition and enforcement of the SCC Final Award.

## PARTIES

8. Gardabani Holding BV ("Gardabani"), a private limited liability company established under the laws of the Netherlands. Gardabani owns 100% of JSC Khrami HPP-1 ("Khrami-1") and JSC Khrami HPP-2 ("Khrami-2") (collectively, the "Khrami Companies"), which are electricity generation companies incorporated in Georgia.

9. JSC Telasi ("Telasi"), a joint stock electricity distribution company incorporated in Georgia.

10. Respondent is the Republic of Georgia, a foreign State within the meaning of the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a), which provides that the United States District Courts shall have original subject matter jurisdiction over any nonjury civil action against a foreign State unless the foreign State is entitled to immunity under the FSIA or an applicable international agreement.

12. This Court also has subject matter jurisdiction over this proceeding pursuant to Section 203 of the FAA, which provides that actions or proceedings falling under the New York Convention arise under the laws and treaties of the United States and are subject to the original jurisdiction of the district courts of the United States. 9 U.S.C. § 203. This proceeding arises

under the New York Convention because it is an action in the United States to recognize and enforce an arbitral award made in Sweden, a state-party to the Convention.

13.     Pursuant to the United States' ratification of the Convention on September 30, 1970, and its implementing legislation under Chapter 2 of the FAA, the United States will enforce arbitral awards made in the territory of another contracting state, where such award applies to disputes arising out of legal differences, whether contractual or not, that are considered commercial.  *See* 9 U.S.C. § 202 ("An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention"); *see also* Status – Convention on the Recognition and Enforcement of Foreign Arbitral Awards, http://www.newyorkconvention.org/countries.

14.     The SCC Final Award was rendered in Sweden, which ratified the Convention without reservations on January 28, 1972.  *Id.*

15.     As detailed below, the SCC Final Award arises out of Georgia's breach of its obligations under binding contracts with Petitioners, and specifically the provisions of those agreements relating to the applicable tariffs that the Petitioners could charge to customers in Georgia.  Each of the relevant agreements contained an arbitration clause in which Georgia agreed to arbitrate disputes before the SCC, among other forums.  See Toossi Decl. Ex. B at 380 ("The seat of arbitration shall be the city of Stockholm").

16.     The SCC Final Award was rendered against a foreign state, Georgia, in favor of Petitioners, and is not between citizens of the United States.  *Cf.* 9 U.S.C. § 202.

17.     Georgia is not entitled to immunity here.  A foreign state does not enjoy sovereign immunity from a proceeding:

in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . or (D) paragraph (1) of this subsection is otherwise applicable.

28 U.S.C. § 1605(a)(6) (emphasis added). Again, as described in more detail below, the SCC Final Award was rendered in an arbitration that was authorized and agreed upon by Georgia as a signatory to agreements that contained arbitration clauses. Moreover, the SCC Final Award is governed by the New York Convention, an international agreement in force in the United States calling for recognition and enforcement of the Final Award. Georgia is further not entitled to immunity because it waived such immunity by affirmatively consenting to the arbitration of the parties' underlying dispute. *See* 28 U.S.C. § 1605(a)(l), (6).

18. This Court may exercise personal jurisdiction over Georgia pursuant to 28 U.S.C. § 1330(b), which provides that the United States District Courts have personal jurisdiction over a foreign State that—like Georgia in this action—is not entitled to immunity, provided that service of process is effected in accordance with 28 U.S.C. § 1608. Petitioners intend to serve process in a timely manner on Georgia pursuant to 28 U.S.C. § 1608(a), including, if required, through the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163.

19. Venue is proper in this district under 28 U.S.C. § 1391(f)(4), which provides that a party may bring a civil action against a foreign State in the United States District Court for the District of Columbia.

## THE DISPUTE AND THE AWARD

20. Petitioners, through their wholly or majority-owned subsidiaries, were participants in the Georgian energy sector, specifically operating in electricity generation and distribution. Toossi Decl., Ex. B at ¶ 10. Georgia's energy sector is subject to a series of regulated tariffs, and during Petitioner's operations in Georgia, the Georgian government entered into several written agreements that stipulated the tariffs which Petitioners were entitled to charge. *See, e.g., id.* at ¶¶ 109 (E), 122 (G), 124 (H), 140, 176, 179. When Georgia breached these agreements and imposed tariffs inconsistent with its agreements, it violated both contractual and treaty law, and Petitioners initiated claims with the SCC and ICSID. Toossi Decl., Ex. B at ¶¶ 16, 25. Ultimately, after a nearly five-year arbitration, the three-arbitrator panel found that Georgia had, in fact, violated its agreements with Petitioners and ordered Georgia to pay damages in the amount of $27,499,000 (USD) to Gardabani and $84,500,000 (USD) to Telasi, Toossi Decl., Ex. A at ¶ 88-89, as well as interest to accrue from December 24, 2021 until the date of payment in full, Toossi Decl., Ex. A at ¶ 125.

### Description of Georgian Tariff System

21. After the collapse of the Soviet Union, the Georgia electricity sector transitioned from a state-owned system to a liberalized system, separating different electricity-related activities, including transmission, distribution, and generation. *See* Toossi Decl. Ex B at ¶ 65. Although a new legal and regulatory framework was established, shortages were still common. *Id.* Georgia's early efforts to modernize included selling a majority share of Telasi, transferring the management of the Khrami Companies to private companies, and bringing in other foreign companies to manage transmission and wholesale electricity market operators. *See id.* at ¶ 66. Despite these efforts to privatize the electricity market, power outages were still commonplace,

and Georgia needed to continue to rehabilitate its state-owned electricity generation, transmission, and distribution assets by attracting further investment. *Id.*

22. The 1999 Law on Electricity and Natural Gas allocated the ownership, commercial and regulatory functions in the power sector between the Ministry of Energy (the "MOE") and what would later become the Georgian National Energy and Water Supply Regulatory Commission (the "NERC"). *See id.* at ¶ 67. The MOE is responsible for developing national energy policy and promoting investments in the sector, while the NERC has the exclusive competence to adopt tariff-setting methodologies and determine tariffs accordingly. *See id.* at ¶¶ 68, 69. In addition to overseeing the tariffs that distribution companies can charge, controlling the issuance of generation and distribution licenses, and setting the fees for connecting new users to the distribution network, the NERC also produces an annual energy plan of how much energy each distribution company (and since July 1, 2021, each energy supply company) will acquire from each generator on a month-to-month basis over the course of a year. *See id.* at ¶ 73.

23. During the period of time relevant to the dispute discussed below, the NERC regulated energy tariffs, including:

- The Generation Tariffs, which cover generation, operating costs, capital expenditures of an energy generation company, plus profit. *Id.* at ¶ 80.

- The Consumer Tariffs, which are the rates that a distribution company can charge to its customers, and which form the revenue of distribution company's business. *Id.* at ¶¶ 81, 82.

- The Weighted Average Purchase Tariff, which is a distribution company's weighted average annual cost per kilo watt hour of purchasing energy from generation companies. *Id.* at ¶¶ 81, 83.

- The Distribution Tariffs, which are the difference between the amount the distributor pays to acquire electricity it is going to distribute and the amount it charges the customer, to profit. *Id.* at ¶¶ 81, 84.

8

The NERC guidelines, which are updated periodically, outline the methodology for calculation of the tariffs. *See id.* at ¶ 89.

### Background of the Dispute

24. In 2003, Inter RAO made a significant investment in Georgia's energy sector, acquiring, among other investments, (a) a 75% indirect interest in Telasi, (b) the shares of a company with management rights for the JSC Khrami HPP-1 ("Khrami-1") and JSC Khrami HPP-2 ("Khrami-2") (collectively, the "Khrami Companies"), which are electricity generation companies incorporated in Georgia, and (c) shares of Gardabani, which wholly owned AES Mktvari (collectively, the "2003 Acquisition"). Toossi Decl., Ex. B at ¶ 94.

25. Telasi was established in 1995 as a Georgian joint stock company. *Id.* at ¶ 90. During the relevant period in dispute, Telasi has been the second-largest distribution company of the three operators in Georgia, and covers Tbilisi and the surrounding urban areas. *Id.* From 1995 to 1998, it was State-owned. *Id.* In December 1998, the Government began privatizing distribution companies and power plants. *Id.* The sale of Telasi in 1998 to an American corporation marked the first major privatization in the Georgian electricity sector. *Id.* Pursuant to a share purchase agreement, AES Silk Road Holdings B.V. ("Silk Road") acquired 75% of the shares of Telasi (the "Telasi SPA"). *Id.*

26. The Telasi SPA established long-term tariff rules for calculating and adjusting the tariffs applicable to Telasi's sale of electricity over two time periods, April 1, 1999 to September 30, 2008 and October 1, 2008 onwards. *Id.* at ¶ 100. The Telasi SPA allocated three main risks between the parties: (i) changes in currency; (ii) changes in inflation; and (iii) changes in the WAPT. The first period featured fixed Distribution Tariffs which were to be adjusted to take into account inflation, currency fluctuations and increases to the costs of purchasing energy. *Id.* at 101.

27. After the 2003 Acquisition, the tariff related arrangements between the Government and the Petitioners were modified several times by the Memoranda concluded in 2007, 2010 (the "2010 Memorandum"), 2011 (the "2011 Memorandum"), 2012 and, finally, 2013 (the "2013 Memorandum"). *Id.* at ¶ 99. The NERC implemented resolutions in accordance with the Memoranda. *See e.g., id.* at ¶¶ 121, 143, 178.

28. Following the conclusion of the 2010 Memorandum, Inter RAO and Georgia entered into a Sale and Purchase Agreement for the Khrami Companies (the "Khrami SPA"), pursuant to which Inter RAO group acquired from the Georgian Government 100% shares in each of the Khrami Companies. *Id.* at ¶ 124. The Khrami SPA set out fixed long-term Generation Tariffs for the Khrami Companies, which replicate the tariffs provided for in the 2011 Memorandum and uses similar wording. *Id.* at ¶ 140. For example, the Khrami SPA, incorporating tariffs and terms of correction from the 2011 Memorandum, provided for an agreed fixed increase of the Khrami Companies' tariffs but also for further upward adjustments of the tariffs triggered by devaluation of the Georgian currency against foreign currencies, such as the Japanese Yen and US Dollar. *See generally id.* at ¶¶ 137-141. In the event Georgia failed to implement the Khrami SPA, Georgia was obligated to indemnify Gardabani for the consequences of failing to do so. *See id*. at ¶ 142.

29. The 2013 Memorandum, which superseded any previous memoranda in their entirety, set out a long-term tariff regime for Telasi and the Khrami Companies. *Id.* at ¶¶ 180-81. The NERC issued a resolution establishing Telasi's tariffs until December 31, 2025 at identical rates to those set out in the 2013 Memorandum. *See id*. at ¶¶ 180, 183. As the Khrami Companies' tariffs specified under the Khrami SPA and the 2011 Memorandum did not change in the 2013 Memorandum, NERC Resolutions remained in force. *See id*. at ¶ 183. For Telasi, under the 2013 Memorandum, from January 1, 2017, Consumer and Distribution Tariffs were to

10

revert to the levels in place on December 31, 2012 level until December 31, 2025 (namely, the Consumer and Distribution Tariffs levels set under the 2011 Memorandum). *See id.* ¶ 187.

30. Subsequently, in 2014, however, Georgia adopted a new methodology for regulating tariff-setting (the "2014 Methodology"), which were contrary to the negotiated tariffs in the 2013 Memorandum and did not include the agreed upon tariff adjustments. *See id.* at ¶¶ 208, 218, 220. As a result, on September 3, 2015, the NERC established Telasi's new Consumer and Distribution Tariffs using the 2014 Methodology, which were different from those stipulated in the 2013 Memorandum. *Id.* at ¶ 241. Following the entry into force of the 2013 Memorandum, the weighted average tariff for the purchase of electricity (the "WAPT") sharply increased, resulting in a sharp increase of Telasi's costs. In addition, the Georgian currency, lari, sharply devalued against the USD. Both factors triggered Telasi's entitlement to significant tariff increases under the 2013 Memorandum. However, the NERC allowed only a partial increase of Telasi's tariffs, which fell far short of the increases required under the 2013 Memorandum. *See generally id.* at ¶¶ 243-255.

31. On May 19, 2016, Telasi applied to the NERC pursuant to the 2013 Memorandum for approval of the Distribution Tariff adjustments it had calculated. *See id.* at 260. On May 30, 2016, the NERC declined to adjust Telasi's Distribution Tariff, stating that it could only adjust Telasi's tariffs according to the 2014 Methodology, and not based on the 2013 Memorandum. *Id.* at 261.

32. Using the 2014 Methodology, the NERC also calculated tariffs applicable to the Khrami Companies that ran contrary to the Khrami SPA and the 2013 Memorandum. *See generally id.* at 282-88. In October 2016, the NERC declined to the Khrami Companies' applications to adjust their tariffs pursuant to provisions in the Khrami SPA and the 2011 Memorandum, stating that Khrami-1's tariff application did not meet the requirements set out

under the 2014 Methodology, and making a similar decision with respect to Khrami-2's application. *See id.* 292-93. Similarly, the Khrami Companies' application to adjust their tariffs was rejected by the NERC in 2017. *See generally* 298-316. As a result, from 2015 to 2017, NERC refused to comply with the contractually agreed-upon Generation Tariff increases to offset any currency devaluation or provide adequate compensation. *See generally id.* at ¶¶ 341—377.

### The SCC Arbitration

33.     As a result of Georgia's actions affecting the Petitioners' investments in Georgia's electricity sector, which were governed by successive tariff-setting agreements, Petitioners advanced several claims before the SCC tribunal. Petitioners claimed, *inter alia*, that Georgia breached its obligations by unreasonably failing to ensure that the tariffs applicable to Telasi and the Khrami Companies were set and adjusted as provided for in the 2013 Memorandum and the Khrami SPA. *See* Toossi Decl., Ex. B at ¶ 374.

34.     On June 9, 2017, before the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC"), Petitioners initiated an arbitration ("SCC Arbitration") against the Government of Georgia generally, the Georgia Ministry of Economy and Sustainable Development in Georgia, and the State Service Bureau. *Id.* at ¶ 16.

35.     On August 4, 2017, ICSID received a request for arbitration from Gardabani and Silk Road Holdings against Georgia (the "ICSID Arbitration"). *Id.* at ¶ 25. On February 14, 2018, the Parties submitted a joint request to the SCC for the arbitration to be coordinated with the ICSID Arbitration such that both proceedings would be arbitrated by the same panel (the "Tribunal"). *Id.* at ¶ 31.

36.     The parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be

appointed by each party and the third, presiding arbitrator to be appointed by agreement of the two arbitrators. *Id*. at ¶ 27. The co-arbitrators subsequently proposed, and the Parties agreed on November 30, 2017, to the selection of presiding arbitrator pursuant to a list procedure administered by the co-arbitrators with the assistance of the ICSID Secretariat. *Id.* at ¶ 28.

37. The Tribunal was originally composed of Mr. Henri C. Alvarez KC, a national of Canada, President, appointed by agreement of his co-arbitrators and pursuant to a list procedure; Professor Horacio Grigera Naón, a national of the Argentine Republic, appointed by the Petitioners; and Professor Zachary Douglas KC, a national of Australia, appointed by the Respondent. *Id*. at ¶ 29. Pursuant to the Parties' agreement to have the same Tribunal adjudicate both the ICSID Arbitration and the SCC Arbitration, Professor Horacio Grigera Naón's resigned, and Professor Stanimir Alexandrov was appointed to replace him. *Id.* at ¶ 33.

38. The ensuing SCC Arbitration was conducted in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce in accordance with the "Arbitration Section" of the 2013 Memorandum and the "Dispute Settlement" section of the Khrami SPA. *Id.* at ¶ 1, fn. 1 & 2. The same Tribunal also conducted in parallel the ICSID Arbitration in accordance with the ICSID Arbitration Rules and the BIT. A hearing on the merits for both the SCC and ICSID proceedings was held in Paris from October 14, 2019 through October 25, 2019. *Id.* at ¶ 59. Both sides were represented by counsel. Georgia was represented throughout the ICSID Arbitration and the SCC Arbitration by White & Case LLP.

39. On September 9, 2022, the Tribunal issued a final award in the SCC Arbitration ("Final SCC Award").[3] Toossi Decl. Exhibit A. The Final SCC Award determined damages owed to Telasi from the period of July 1, 2021 to December 31, 2025 (on top of damages for the

---

[3] The Tribunal issued several partial awards to resolve certain issues, and the partial awards were ultimately resolved in the Final SCC Award.

13

preceding period determined prior to that date in an interim arbitration award) and awarded compensation to Gardabani and Telasi for breach of the Khrami SPA and 2013 Memorandum. *Id.* at ¶ 89.  The Final SCC Award required Georgia to pay to Gardabani a sum of $27,499,000 and to pay Telasi a sum of $84,500,000, a total amount of $111,999,000.  *Id.* at ¶¶ 88, 89.  The Final SCC Award also ordered Georgia to pay interest on the amounts awarded at the six-month USD SOFR rate plus 2% from December 24, 2021 until payment was made in full.  *Id.* at ¶ 125(h).

40. The ICSID Arbitration was closed on September 27, 2022.  On October 27, 2022, the Secretary-General of ICSID dispatched the Tribunal's Award (the "ICSID Award"), effectively finding that Georgia's failure to meet its contractual obligations towards the Petitioners also comprised a violation of Article 3(4) of the BIT.  The Tribunal awarded Petitioners monetary damages (plus pre-award interest) in the amount of $48,427,000 to Silk Road and $27,499,000 to Gardabani, amounting to $75,926,000 in total damages, together with simple interest on the amounts awarded at the six-month USD SOFR rate plus 2% from December 24, 2021 until payment was made in full.  Finally, the parties would share equally the costs of the Arbitration and bear their own legal costs and other expenses.

41. The Tribunal found that the Petitioners' ICSID claims were admissible despite the award granted in the SCC Arbitration.  However, the amounts awarded were subject to any payments made by Georgia to the SCC Claimants and Petitioner's express undertaking not to seek double compensation.  To date, Georgia has not paid any damages due under the SCC Final Award or the ICSID Award.  Should Georgia make any payments towards the SCC Final Award, Petitioners will promptly notify the Court and indicate how, if at all, such payment affects the ICSID Award.

42. Georgia has previously attempted and failed to set aside the SCC Final Award in Sweden, the seat of arbitration. Georgia brought actions for annulment and challenge before the Court of Appeal in Sweden to annul or set aside the SCC's Partial Award on Liability, the First Partial Award on Damages, the Second Partial Award on Damages and the SCC Final Award. In its appeal, Georgia argued that the SCC Awards should be annulled because they (a) were incompatible with public policy in Sweden and principles of tort law in Swedish law, (b) contravened fundamental principles of international competition and consumer law in certain respects, (c) constituted an excess of mandate, and (d) the Tribunal had failed in certain respects to provide sufficient reasons for the SCC Awards.

43. On July 15, 2024, the Swedish Court of Appeal dismissed Georgia's appeal in its entirety, upheld the Award, and barred Georgia from further appeal to the Supreme Court of Sweden. *See* Toossi Decl., Ex. E. Specifically, the Swedish Court of Appeal found that there had been no excess of mandate or procedural error in any of the respects alleged by Georgia, and it therefore did not set aside the SCC Awards in any part.

## LEGAL BASIS FOR RELIEF

44. As detailed above, the Khrami SPA and the 2013 Memorandum contained valid and enforceable arbitration clauses that specifically authorized resolution of disputes before the SCC.

45. Under Section 207 of the FAA, a court "shall confirm" an award covered by the New York Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207.

46. None of the New York Convention grounds for denying recognition and enforcement of an award applies in this case, and so the SCC Final Award should be confirmed. *See Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 120 (D.D.C.

15

2015) ("[T]he FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards.") (citation omitted). Moreover, Georgia previously attempted and failed to set aside the SCC Final Award in Sweden, the seat of arbitration. Georgia brought actions for annulment and challenge before the Court of Appeal in Sweden to annul or set aside the SCC's Partial Award on Liability, the First Partial Award on Damages, the Second Partial Award on Damages and the SCC Final Award. In its appeal, Georgia argued that the SCC Awards should be annulled because they (a) were incompatible with public policy in Sweden and principles of tort law in Swedish law, (b) contravened fundamental principles of international competition and consumer law in certain respects, (c) constituted an excess of mandate, and (d) the Tribunal had failed in certain respects to provide sufficient reasons for the SCC Awards. On July 15, 2024, the Swedish Court of Appeal dismissed Georgia's appeal in its entirety, upheld the Award, and barred Georgia from further appeal to the Supreme Court of Sweden. See Toossi Decl., Ex. E. Specifically, the Swedish Court of Appeal found that there had been no excess of mandate or procedural error in any of the respects alleged by Georgia, and it therefore did not set aside the SCC Awards in any part. The grounds Georgia raised in Sweden closely mirror those available under the New York Convention for resisting enforcement.

47. For the foregoing reasons, Petitioners are entitled to an order confirming, recognizing, and enforcing the Final Award pursuant to 9 U.S.C. § 207. The Court should accordingly recognize and enforce the SCC Award.

**THE SCC FINAL AWARD MUST BE RECOGNIZED AND ENFORCED**

48. Petitioners restate and incorporate Paragraphs 1 through 46 as if set forth fully herein.

49. The SCC Final Award, a binding arbitration award, has been issued in Petitioners' favor.

16

50. The SCC Final Award is subject to recognition and enforcement in the United States pursuant to Section 207 of the FAA.

51. Petitioners are thus entitled to an order recognizing the SCC Final Award as a judgment pursuant to Section 207 of the FAA, and enforcing the pecuniary obligations imposed by the Award by entering judgment thereon in the full amount of the SCC Final Award, with ongoing interest to accrue pursuant to paragraph 125 of the SCC Final Award until the SCC Final Award is paid in full, in addition to the costs awarded by the Tribunal and the costs of this proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners pray that the Court enter an Order:

a. Recognizing and enforcing the SCC Final Award as a judgment of this Court, pursuant to Section 207 of the FAA;

b. Entering judgment in favor of Petitioners and against Georgia in the amount of the full value of the SCC Final Award, i.e., (i) damages awarded by the arbitral tribunal in the amount of $27,499,000 (USD) to Gardabani and $84,500,000 (USD) to Telasi; and (ii) ongoing interest as provided by the arbitral tribunal, accruing from December 24, 2021 until the date of payment in full;

    c. Ordering Georgia to pay the costs of this proceeding; and

    d. Granting Petitioners such other and further relief as the Court deems just and proper.

Dated: June 25, 2025
       New York, New York

                                              Respectfully submitted,

                                              */s/ Amir H. Toossi*
                                              Amir H. Toossi
                                              Akrivis Law Group, PLLC
                                              747 Third Avenue, 32nd Floor
                                              New York, NY 10022
                                              Email: atoossi@akrivislaw.com
                                              Telephone: (347) 949-0548

                                              *Counsel for Petitioners*