# EXHIBIT A

## THE ARBITRATION INSTITUTE OF THE
## STOCKHOLM CHAMBER OF COMMERCE

**GARDABANI HOLDINGS B.V.**
**INTER RAO UES PJSC**
**TELASI, JSC**

**Claimants**

*v.*

**GEORGIA**
**MINISTRY OF ECONOMY AND SUSTAINABLE DEVELOPMENT OF GEORGIA**
**STATE SERVICE BUREAU LTD**

**Respondents**

SCC Arbitration V2018/039,
administered by ICSID as ICSID Case No. ADM/18/1

---

### FINAL AWARD

---

### *Members of the Tribunal*

Mr. Henri C. Alvarez KC, President of the Tribunal
Professor Stanimir Alexandrov, Arbitrator
Professor Zachary Douglas KC, Arbitrator

### *ICSID Legal Counsel*

Mr. Alex Kaplan

*Date of dispatch to the Parties*: 9 September 2022

### REPRESENTATION OF THE PARTIES

**Counsel for the Claimants:**

Mr. Noah Rubins KC
Ms. Vasuda Sinha
Ms. Mariia Puchyna
Mr. Maxim Pyrkov
Ms. Veronika Timofeeva

Freshfields Bruckhaus Deringer LLP
9 avenue de Messine
75008 Paris
France

and

Mr. Alexey Yadykin
Mr. Dmitry Surikov

Stonebridge Legal LLC
Kadashevskaya nab 14/2
119017 Moscow
Russian Federation

and

Mr. Avto Svanidze
Ms. Mariam Vashakidze

Dentons Georgia LLC
Melikishvili street # 10
Tbilisi 0179
Georgia

**Counsel for the Respondents:**

Ms. Mariam Gotsiridze
Ministry of Justice of Georgia
Gorgasali st. 24a
0114 Tbilisi
Georgia

and

Mr. Charles Nairac
Ms. Kirsten Odynski
Ms. Noor Davies
Ms. Anaïs Harlé
Ms. Elina Aleynikova

White & Case LLP19
Place Vendôme
75001 Paris
France

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     THE PARTIES ................................................................................................... 2

III.    PROCEDURAL HISTORY OF THE PROCEEDINGS .................................................. 3

IV.     CLAIMANTS' APPLICATION IN RESPECT OF GARDABANI'S LOSSES ................... 7

        A.  Mr. Peer's Approach ............................................................................ 10

        B.  Dr. Moselle's Approach ....................................................................... 11

        C.  Tribunal's Analysis ............................................................................. 13

V.      COMPENSATION OWED TO TELASI FOR THE FORECAST PERIOD ...................... 14

        A.  Disagreement 1: Valuation Date .......................................................... 15
        i.   Mr. Peer's Approach ............................................................................ 16
        ii.  Dr. Moselle's Approach ........................................................................ 22
        iii. The Tribunal's Analysis ........................................................................ 30

        B.  Disagreement 2: the Components of FCFF ........................................... 33
        i.   Mr. Peer's Approach ............................................................................ 34
        ii.  Dr. Moselle's Approach ........................................................................ 36
        iii. The Tribunal's Analysis ........................................................................ 39

VI.     CONCLUSION .................................................................................................. 40

VII.    INTEREST ....................................................................................................... 41

        A.  The Claimants' Position ....................................................................... 41

        B.  The Respondents' Position ................................................................... 43

        C.  The Tribunal's Analysis ....................................................................... 44

VIII.   COSTS ............................................................................................................ 45

        A.  The Claimants' Position ....................................................................... 46

        B.  The Respondents' Position ................................................................... 49

        C.  The Tribunal's Analysis ....................................................................... 53

IX.     CONCLUSION AND ORDERS ............................................................................. 55

## LIST OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| **1H 2021** | The first six months of 2021 |
| **2006 Energy Policy** | Resolution of Georgia's Parliament on the main directions of Georgia's energy sector policy; in order to attract investments and development competition, electricity distributioncompanies had to be privatized, and provided different types oftariffs to protect consumers from monopolistic prices and permit long-term sustainable growth (RL-0006) |
| **2006 Tariff Resolution** | 15 May 2006 NERC Resolution No. 18 fixed Telasi's WAPT at 4.303 tetri/kWh and its average Distribution Tariff at 7.89 tetri/kWh, effective 1 June 2006 (R-0014) |
| **2007 Memorandum** | 20 June 2007 agreement between Inter RAO and the Government; established long-term tariff policy for Telasi until 2015 (C-0005 / R-0015) |
| **2010 Memorandum** | 1 October 2010 non-binding memorandum of understanding between Inter RAO and the Government; set out the terms by which Telasi's share capital could be increased to settle certain historical institutional debts and to prepare for an IPO (C-0006 / R-0018) |
| **2011 Memorandum** | 31 March 2011 Memorandum on the Development of Cooperation in the Electric Power Sector and the Implementation of Previous Agreements, between Inter RAO and the Government; it was agreed that Inter RAO wouldacquire the Khrami Companies for USD 104 million and that Georgia would set long-term tariffs for both Telasi and the Khrami Companies (C-0015 / R-0019); *see also* Khrami SPA, 12 April 2011 (C-0016) |
| **2012 Temporary Memorandum** | 26 December 2012 transitional memorandum between Inter RAO and the Government; temporarily reduced Telasi's Consumer Tariffs for household consumers (line voltage 101 kWh-301 kWh) and recorded the parties' agreement to sign a new definitive memorandum and replace the 2011 Memorandum within 3 months (C-0030) |
| **2013 Memorandum** | 31 March 2013 agreement between Georgia, the Partnership Fund JSC (a Georgian state-owned company), Inter RAO, Telasi, and the Khrami Companies, which superseded the 2007, 2011 and 2012 Memoranda (C-0034 / R-0028) |

| Abbreviation | Definition |
|---|---|
| **2011 Methodology** | 8 June 2011 NERC's Methodology for Electricity Tariff Calculation (CL-0081) |
| **2014 Amended Methodology** | 10 August 2017 NERC Resolution No. 20 substantially amended the 2014 Methodology |
| **2014 Methodology** | 30 July 2014 NERC's new tariff methodology for Distribution Tariffs and Consumer Tariffs; did not specifically exempt companies that had specific tariff agreements (CL-0084) |
| **2H 2021** | The last six months of 2021 |
| **AES** | AES Mtkvari LLC; local Georgian thermal power generation company, acquired by Inter RAO in 2003 |
| **CEO** | Chief Executive Officer |
| **Claimants** | Collectively, SCC Arbitration Claimants and ICSID Arbitration Claimants |
| **Consumer Tariffs** | Maximum rates that a distribution company (in this case, Telasi) can charge to its customers, and which form the revenue component of a distribution company's business; comprise the sum of the WAPT and the Distribution Tariff |
| **COPS** (also known as **ESCO**) | Commercial Operator of Power System / Electricity System Commercial Operator; Georgian State-owned company responsible for operating the electricity market |
| **Cost-Plus** | Tariff methodology in force after 1 October 2008 and until the 2011 Methodology; covered costs and a reasonable rate of return |
| **CPI** | Consumer Price Index; average annual inflation rate published by the National Statistics Office of Georgia |
| **DCF** | Discounted cash flow |
| **Discounting Rate** | Rate at which free cash flow to the firm (FCFF) is discounted |
| **Distribution Tariff** or **Distribution Margin** | Computed for different voltage levels as the distributor's forecast per unit cost, calculated on a regulatory basis; not rates charged to customers, but rather they represent a distribution company's margin on a tetri per kWh basis |
| **EBITDA** | Earnings before interest, tax, depreciations and amortization are paid |
| **EC** | European Commission |

| Abbreviation | Definition |
|---|---|
| **Electricity Balance** | Before the start of each year, the GSE prepares, and the MOE approves, the electricity balance; includes a general forecast of the output of each generating plan, an estimate of electricity imports and exports, and a forecast of total electricity sales by each distribution company (CL-0073, Article 23.1) |
| **Energo-Pro** | Energo-Pro is one of Georgia's three electricity distributors, along with Telasi and Kakheti |
| **Enguri** | Enguri HPP LLC, along with Vardnili, are the two largest HPPs generation companies in Georgia and are State-owned |
| **ESCO** (also known as "**COPS**") | The Electricity System Commercial Operator (also known as the Commercial Operator of Power System); State-owned balancer of electricity on the market by trading the volume of electricity delivered into the network by generators and importers which is not purchased under direct agreements with distributors |
| **EU** | European Union |
| **FCFE** | Free cash flow to equity is used to determine losses at the shareholder level, and measures how much cash is available to equity-holders of a company after changes in net borrowings and interest is paid |
| **FCFF** | Free cash flow to the firm is used to determine losses at the local level, and measures the financial performance of a company by expressing the amount of cash generated by a firm after considering expenses, taxes, and changes in net working capital and investments |
| **Forecast Period** (The Claimants/ Mr. Peer) | 1 July 2021–31 December 2025: the period for thecalculation of the future period's losses |
| **Gardabani** | Gardabani Holdings B.V. |
| **GACG** | General Administrative Code of Georgia (RL-0005) |
| **GCC** | Georgian Civil Code (RL-0009) |
| **Generation Tariffs** | The rates that can be charged by each company for the sale of the energy it generates |
| **GEL** | Georgian national currency Lari |
| **GID** | Gross Income Deficit |
| **The Government or Georgia** | Georgia (collectively the Respondents: Georgia, Ministry of Economy, and State Service) |
| **GR** | Gross Revenue |

| Abbreviation | Definition |
|---|---|
| **GRD** | Gross Revenue Deficit |
| **GSE** | Georgian State Electrosystem; State-owned entity which has been designated as the transmission system operator (TSO) |
| **Historical Period** (The Claimants/ Mr. Peer) | 1 January 2013–31 December 2017: the period for the calculation of the actual losses |
| **HPP/HPP Chain** | The Hydro Power Plants or Chain of Hydro Power Plants referred to in the 2007 and 2011 Memoranda |
| **HPPs** | Hydropower plants |
| **ICSID Claimants** | Collectively Silk Road and Gardabani |
| **ICSID Respondents** | Collectively the Government of Georgia, Ministry of Economy, and State Service |
| **Inter RAO** | Inter RAO UES, PJSC |
| **IPO** | Initial public offering |
| **Kakheti** | Until 2017, Kakheti Energy Distribution supplied electricity to Kakheti, the eastern region of Georgia, and was one of three electricity distribution companies, along with Telasi and Energo-Pro; in 2017, it was acquired by Energo-Pro |
| **Khrami-1** | JSC Khrami-1 |
| **Khrami-2** | JSC Khrami-2 |
| **Khrami Companies, the** | Collectively Khrami-1 and 2. |
| **Khrami SPA** | 12 April 2011 sales and purchase agreement for Gardabani's acquisition of 100% of the Khrami Companies for USD 104 million (C-0016); *see also* 2011 Memorandum (C-0015 / R-0019) |
| **kWh** | Kilowatt hour |
| **Law on Electricity** | Law of Georgia on Electricity and Natural Gas, adopted in 1997 and amended in June 2017 (and passed in May 2018); separates and allocates the ownership, commercial and regulatory functions between the MOE and the NERC (CL-0073 / RL-0001) |
| **Law on INRAs** | Law on Independent National Regulatory Authorities; governs NERC (RL-0004) |
| **Ministry of Economy** | Ministry of Economy and Sustainable Development of Georgia |
| **MOE** | Ministry of Energy and Sustainable Development; implements Georgia's energy policy; Second Respondent |

| Abbreviation | Definition |
|---|---|
| **NERC** | Georgian National Energy and Water Supply Regulatory Commission; national electricity regulator and monitor |
| **NERC Annual Energy Plan** | NERC sets an annual plan, based on the Electricity Balance approved by the MOE, indicating how much energy each distribution company will acquire from each generator on a month-to-month basis over the course of a year |
| **NERC Resolution No. 3** | 3 April 2013 resolution which amended Resolution No. 33 (2008) to include the new tariffs applicable to Telasi from 1 April 2013 onwards; implemented the tariffs in the 2013 Memorandum (CL-0083) |
| **NERC Resolution No. 5** | 7 April 2011 (CL-0080); implemented the tariffs in the 2011 Memorandum and Annex 1 of the Khrami SPA |
| **NERC Resolution No. 23** | 27 December 2012 (CL-0082, initially mislabeled by the Claimants as C-0082); implemented the tariffs in the 2012 Temporary Memorandum |
| **NERC Resolution No. 33** | NERC Resolution No. 33 "On Adoption of Electricity (Capacity) Rates", 4 December 2008 (CL-0078); implemented the tariffs in the 2007 Memorandum; updated 3 April 2013 (CL-0083) |
| **NERC Resolution No. 48** | Prescribes the Telasi Consumer Tariffs for 2018–2020 (CL-0091) |
| **NGI** | Necessary Gross Income |
| **NPV** | Net present value |
| **NWC** | Net working capital |
| **OB** | Opening balance – data at the beginning of the period |
| **OPEX** | Operational Expenses: expenses related to the operation and maintenance of the electricity distribution grid, and other current expenses related to the regulated activity (2014 Methodology, CL-0084) |
| **Partnership Fund JSC** | Georgian State-owned company, owns 24.64% of Telasi |
| **Purchase Portfolio** | Allocation of energy purchases from different generators to a distributor; each distributor's purchase portfolio includes a combination of more and less expensive sources of energy for the year; NERC's Annual Energy Plan for each distribution company identifies, for each month, the generation companies from which a particular distribution company must purchase electricity, and in what volumes |
| **RAB** | Regulatory Asset Base (2014 Methodology, CL-0084) |

SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

| Abbreviation | Definition |
|---|---|
| **RCB** | Regulatory Cost Base (2014 Methodology, CL-0084) |
| **Revised Valuation Date** | 31 December 2018 |
| **RGR** | Required Gross Revenue to cover infrastructure costs, Conditionally Fixed Costs, Agreed Investments, interest on loans, income tax, Reserve Income, compensation for negative changes in the legislation of Georgia in accordance with section 5.2 of the 2013 Memorandum (Appendix 1, C-0034) |
| **SCC Claimants** | Collectively Inter RAO, Telasi and Gardabani |
| **Scenario 1 (But-For)** (Claimants/Peer) | Takes into account Telasi's Consumer Tariffs and Khrami Companies' Generation Tariffs, calculated in accordance with 2013 Memorandum for both the Historical and Forecast Periods |
| **Scenario 2 (Actual)** (Claimants/Peer) | Takes into account Telasi's actual Consumer Tariffs determined by NERC in Historical Period; for Forecast Period, takes into account Telasi's Consumer Tariffs calculated in accordance with the 2014 Amended Methodology |
| **Silk Road** | Silk Road Holdings B.V. |
| **State Service Bureau** | Georgian state-owned entity; Respondent |
| **Stucky Caucasus** | Stucky Kavkaz LLC was a Georgian branch of an international company which was often engaged by Georgia in other projects; Stucky Caucasus prepared the preliminary feasibility study regarding construction of the HPP-chain, dated 28 January 2011 (C-0009) |
| **Telasi** | JSC Telasi, Inter RAO's Georgian distribution company; established in 1995 as a Georgian joint stock company, and owned by Georgia until 1998; 75% bought by AES Silk Road Holdings BV in 1998 |
| **Telasi SPA** | 21 December 1998 share purchase agreement through which AES Silk Road Holdings BV acquired 75% of Telasi (C-0001) |
| **Telmiko** | Telmiko LLC, the new Inter RAO Group Company which took over Telasi's electric supply activities effective 1 July 2021. |
| **Tetri** | 1 Tetri is equal to 0.01 GEL |
| **TIA** | Target Investment Allowance |
| **TOTEX** | Allowed distribution revenues |
| **TPPs** | Gas-fired thermal power plants |
| **TSO** | Transmission system operator |

| Abbreviation | Definition |
|---|---|
| **Twinning Initiative** | Since 2012, and in parallel with the MOE and Inter RAO's negotiations concerning the 2013 Memorandum, NERC was in the process of updating its tariff regime to bring it in line with the best practices of other EU Member States, pursuant to funding provided by the EC's "Twinning Initiative" for inter-EU knowledge sharing and administrative reform, which culminated in the adoption of the 2014 Methodology |
| **Unbundling Regime** | The reform of electrical supply and distribution activities and related changes in the tariff-setting regime of Georgia, which came into effect as of 1 July 2021 |
| **USD** | United States Dollar |
| **Vardnili** | Vardnili HPP LLC, along with Enguri, are the two largest HPP generation companies in Georgia and are state-owned |
| **WACC** | Weighted Average Cost of Capital |
| **WAPT** | Weighted Average Purchase Tariff |

## DRAMATIS PERSONAE

| | |
|---|---|
| Messrs Manuel A. **Abdala** & Julian **Delamer** | The Claimants' regulatory experts on the issues of the regulatory changes in the allocation of Telasi's electricity purchases; submitted three expert reports: First Abdala & Delamer Expert Report, dated 27 June 2018 ("**Abdala & Delamer I**"); Second Abdala & Delamer Expert Report, dated 1 March 2019 ("**Abdala & Delamer II**"); Third Abdala & Delamer Expert Report, dated 16 September 2019 ("**Abdala & Delamer III**") |
| Mr. Mikhail ("Misha") **Antadze** | Telasi's Deputy Commercial Director from at least 2013 until present; attended NERC's roundtable discussions in December 2013 and public hearings in July 2014 regarding the introduction of the 2014 Methodology |
| Mr. George **Bachiashvili** | From November 2012, after Mr. Ivanishvili was elected Prime Minister, Deputy CEO of Georgia's State-owned investment Partnership Fund JSC and Government consultant on team that negotiated 2013 Memorandum (represented the Partnership's interest in the 2013 Memorandum); left these positions at the same time as Prime Minister Ivanishvili voluntarily resigned from office in 2013, and since then, CEO of Georgian Co-Investment Fund financed by Mr. Ivanishvili; 2011 – October 2012, CEO of a private equity fund in Russia owned by Prime Minister Ivanishvili (Unicor Management Company); submitted two witness statements, dated 21 November 2018 and 6 June 2019 |
| Mr. Mamuka **Bakhtadze** | June 2018–September 2019, Georgia's Prime Minister; previously Minister of Finance and managed Georgia's national railway company |
| Mr. Ilia **Eloshvili** | Deputy Minister of Energy to Minister of Energy, Mr. Kaladze, appointed after the change of Government of October 2012 |
| Mr. Giorgi **Gakharia** | Since September 2019, Georgia's Prime Minister; March 2013 – July 2016, Business Ombudsman of Georgia; December 2014 – September 2016, Secretary of Economic Council; November 2016, Minister of Economy and Sustainable Development of Georgia |
| Mr. Irakli **Garibashvili** | 20 November 2013–29 December 2015, Georgia's Prime Minister; former business executive, who entered politics after his business associate Mr. Ivanishvili became Prime Minister in October 2012; appointed Minister of Internal Affairs from 2012-2013; Since September 2019, Minister of Defence |
| Mr. Biszina **Ivanishvili** | Prime Minister elected on 1 October 2012 (Dream Party coalition), appointed to new Government's cabinet on 25 |

|  | October 2012; Decree No. 33 authorized him to sign 2013 Memorandum on Government's behalf (R-0027) |
|---|---|
| Mr. Kakhaber ("Kakha") **Kaladze** | October 2012–July 2017 Vice Prime Minister and Minister of Energy; authorized 2013 Memorandum on behalf of the Government |
| Mr. Devi **Kandelaki** | Khrami Companies' General Director |
| Mr. Alexander ("Aliko") **Khetaguri** | Involved in negotiation of all previous Memoranda between Georgia and Inter RAO from July 2003, when Inter RAO first entered Georgian energy market by acquiring AES, until the change of Government in October 2012, but not the 2013 Memorandum; 1999-2002 NERC's Head and Chief Specialist of the Economic Department; 2002-2004 NERC's Director of Department of Information Management and Methodology; 2004 Deputy Minister of Energy; 2005 First Deputy Minister; 2006 General Director of Georgian Oil and Gas Corporation (GOGC); 2007-2012 Minister of Energy under then Prime Minister of Georgia, Mr. Mikhail Saakashvili; August-October 2012, Minister of Finance; since October 2012, CEO and Director of private sector State Oil Company of Azerbaijan Republic (SOCAR); submitted two witness statements, dated 22 November 2018 and 12 June 2019 |
| Mr. Sergey **Kobtsev** | Since April 2013, Telasi's General Director; previously JOSC Sagtudinskaya HPP-1 (Tadzhikistan) General Director; submitted two witness statements, dated 27 June 2018 and 4 March 2019 |
| Mr. Boris Yurievich **Kovalchuk** | Inter RAO's Chairman of Management Board |
| Mr. Giorgi **Kvirikashvili** | December 2015–June 2018, Georgia's Prime Minister; October 2012–September 2015, appointed by then Prime Minister Mr. Bidzina Ivanishvili as Minister of Economy and Sustainable Development; September 2015–December 2015, Minister of Foreign Affairs; July 2013–December 2015, Deputy Prime Minister |
| Mr. Anatoly **Markov** | Since December 2012, Chief Expert (and from 2017, Sector Head) Inter RAO's Sector Head Asset Management Block for Central Asia and Transcaucasia Division (previously called the Transcaucasia, Turkey and Middle East Geographical Division), headed by Mr. Dmitry Volkov; strategic and operational management of Inter RAO's subsidiaries in Georgia, Armenia, and Turkey; involved in negotiation of 2013 Memorandum; 2010-2012, Chief Expert Inter RAO's South Caucasus, Central Asia and Turkey Geographical Division, supervised by Division Head Mr. Andrey Zavrazhnov; not involved in commercial negotiations of 2011 Memorandum, but was involved by |

|  | supervisor Mr. Dmitry Kostyunin (Head of Directorate of his Geographical Division) in internal discussions of the financial and economic model for the 2011 Memorandum (C-0008); prior to joining Inter RAO in 2010, specialist at PJSC Lukoil; submitted two witness statements dated 27 June 2018 and 1 March 2019 |
|---|---|
| Ms. Irina **Milorava** | Chair of NERC since 17 September 2013; 2006-2009 Deputy General Director ESCO/COPS (State-owned company responsible for trading balance electricity and guaranteed capacity, and operating unified database for wholesale electricity trading); 2009-2013 General Director ESCO/COPS; submitted two witness statements dated 22 November 2018 and 12 June 2019 |
| Mr. Ilnar **Mirsiyapov** | Inter RAO Head of Strategy & Investments; submitted two witness statements dated 26 June 2018 and 22 February 2019 |
| Dr. Boaz **Moselle** | The Respondents' expert on damages; submitted four expert reports: First Expert Report, 23 November 2018 ("**Moselle I**"); Second Expert Report, 13 June 2019 ("**Moselle II**"); Third Expert Report, 22 November 2019 ("**Moselle III**"); Fourth Expert Report, 10 January 2020 ("**Moselle IV**") |
| Mr. Michael **Peer** | The Claimants' expert on damages; submitted four expert reports: First Expert Report, 27 June 2018 ("**Peer I**"); Second Expert Report, 1 March 2019 ("**Peer II**"); Third Expert Report, 6 September 2019 ("**Peer III**"); Fourth Expert Report, 19 December 2019 ("**Peer IV**") |
| Dr. Boaz **Moselle** and Mr. Michael **Peer** | Dr. Boaz Moselle and Mr. Michael Peer submitted a joint expert report on 3 October 2019 ("**JER1**") and a second joint expert report on 21 June 2021 ("**JER2**") |
| Mr. **Sanikidze** | Director of NERC's Tariffs and Economic Analysis Department |
| Dr. Paata **Turava** | The Respondents' Georgian law expert, particularly on the legal nature of the two contracts at issue in the Arbitration, the principles of contractual interpretation applicable to public law contracts, and the entitlement to lost profits under Georgian law; submitted two expert reports, dated 20 November 2018 and 12 June 2019 |
| Ms. Mariam **Valishvili** | October 2008 - 1 October 2017 Deputy Minister of Energy; 1999-2001 Telasi Sales and Revenue Collection Department; 2001-2004 Telasi Director of North Region; 2006 USAID funded Energy Policy Analyst on energy policy and legislation reform and merger of State-owned energy companies; 2007-2008 Deputy Director of International Affairs, then Commercial Director, Georgian Oil and Gas Corporation (GOGC); April 2008 Kala Energy & Natural Resources (investment fund established in 2008 by Mr. Kakhaber Kaladze, Minister ofEnergy October |

| | |
|---|---|
| | 2012-July 2017); since leaving her post as Deputy Minister of Energy on 1 October 2017, advisor to General Director Mr. Khetaguri at State Oil Company of Azerbaijan Republic (SOCAR); submitted two witness statements, dated 21 November 2018 and 10 June 2019 |
| Mr. Dmitry Evgenyevich **Volkov** | Inter RAO's Head of Central Asia and Transcaucasus Assets Management Unit; Mr. Anatoly Markov is Sector Head within this Block |
| Mr. Andrey **Zavrazhnov** | December 2008–September 2011, Inter RAO's Head of Transcaucasia, Turkey and Middle East Geographical Division; participated in negotiations with Government regarding Inter RAO's investments in Georgia, including the 2011 Memorandum and the purchase of the Khrami Companies under the Khrami SPA; currently General Director of LLC TD SMK; submitted two witness statements dated 26 June 2018 and 25 February 2019 |

# I.        INTRODUCTION

1.        This final award addresses the remaining issues relating to the quantification of damages flowing from the Tribunal's previous awards in this matter: the Partial Award in on Liability, dated 19 April 2021 (the "**Partial Award on Liability**"), the Partial Award on Damages, dated 30 July 2021 (the "**First Partial Award on Damages**"), the Partial Award on Damages, dated 23 November 2021 (the "**Second Partial Award on Damages**"), as well as interest and costs.

2.        As stated in the previous Partial Awards, this arbitration concerns a dispute submitted under the Rules of the Stockholm Chamber of Commerce ("**SCC**"), pursuant to the terms of the arbitration agreements contained in the Memorandum on the Development of Cooperation in the Electric Sector and the Implementation of Previous Agreements between the Government of Georgia, the Partnership Fund JSC (a Georgian state-owned entity), Inter RAO UES PJSC, Telasi JSC, the Khrami Companies, Khrami HPP-1 JSC and Khrami HPP-2 JSC, and Mtkvari Energy LLC (owned by Inter RAO) (the "**2013 Memorandum**")[1] and a share purchase agreement between the Government of Georgia, the Ministry of Economy and Sustainable Development of Georgia, the State Service Bureau Ltd. and Gardabani Holdings B.V.(the "**Khrami SPA**").[2]

---

[1] C-0034 (Claimants' Translation) / R-0028 (Respondents' Translation), Memorandum on the Development of Cooperation in the Electric Power Sector and the Implementation of Previous Agreements between (1) Government of Georgia, (2) Partnership Fund JSC and (3) OJSC "INTER RAO UES", (4) Telasi JSC (5) Mtkvari Energy LLC, (6) Khrami HPP-1 JSC, and (7) Khrami HPP-2 JSC dated 31 March 2013 ("**2013 Memorandum**"), Clause 9, "Arbitration Section", which provides at Clause 9.3 that "[a]ny dispute … shall be finally settled by arbitration in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce."

[2] C-0016, Sale and Purchase Agreement on 100% of Shares of the Joint Stock Company "Khrami HPP-1" and 100% of Shares of the Joint Stock Company "Khrami HPP-2" between (1) Government of Georgia, (2) Ministry of Economy and Sustainable Development of Georgia, (3) State Service Bureau LTD and (4) COMPANY "Gardabani Holdings B.V." dated 12 April 2011 ("**Khrami SPA**"), Clause 8, "Dispute Settlement", which provides at Clause 8.4 that "[a]ny dispute … shall be finally settled by arbitration in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce…."

3.      This is one of two arbitrations whose procedure the Parties have agreed to coordinate. This arbitration is referred to as the "**SCC Arbitration**".

4.      The other arbitration concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**") under the Agreement on Encouragement and Reciprocal Protection of Investments between Georgia and the Kingdom of the Netherlands, which entered into force on 1 April 1999 (the "**BIT**" or "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**"). That arbitration is referred to as the "**ICSID Arbitration**".

5.      As discussed later in this Award, the Claimants' claim for damages and the Respondents' counterclaim overlap with their respective claims in the ICSID Arbitration.

## II.      THE PARTIES

6.      The Claimants in this arbitration are PJSC Inter RAO UES ("**Inter RAO**"), a public joint stock company incorporated under the laws of Russia;[3] Gardabani Holding BV ("**Gardabani**"), a private limited liability company established under the laws of the Netherlands;[4] and JSC Telasi ("**Telasi**"), a joint stock electricity distribution company incorporated in Georgia.[5]

7.      Gardabani owns 100% of Khrami HPP-1 JSC ("**Khrami-1**") and JSC Khrami HPP-2 JSC ("**Khrami-2**") (collectively, the "**Khrami Companies**"), which are electricity generation

---

[3]  Inter RAO's address is: 27, Bolshaya Pirogovskaya Street, Building 2, 119435, Moscow, Russia; Netherlands Chamber of Commerce Business Register extract, C-0112. Inter RAO owns an indirect 100% interest in each of Gardabani Holdings BV ("**Gardabani**") and Silk Road Holding BV ("**Silk Road**").

[4]  Gardabani's address is: Strawinskylaan 655, 1077XX Amsterdam; The Netherlands Chamber of Commerce Business Register extract, C-0110.

[5]  Telasi's address under the 2013 Memorandum is: 3 Van Street, Tbilisi 0154, Georgia, C-0034/ R-0028.

companies incorporated in Georgia. Telasi is a subsidiary of Silk Road Holdings BV, which owns 75.11% of Telasi's stock. Gardabani and Silk Road are subsidiaries of Inter RAO.

8.      The Respondents in this arbitration are the Government of Georgia (the "**Government**"); the Georgian Ministry of Economy and Sustainable Development of Georgia ("**Ministry of Economy**" or the "**MOE**"); and the State Service Bureau Ltd ("**SSB**"), a Georgian state-owned entity.[6]

9.      The Parties in the ICSID Arbitration are Gardabani and Silk Road, as Claimants, and Georgia, as the Respondent.

## III.      PROCEDURAL HISTORY OF THE PROCEEDINGS

10.     The procedural history of these proceedings through 23 November 2021 is set out in the Partial Award on Liability, and the First and Second Partial Award on Damages.

11.     In the First Partial Award on Damages, the Tribunal decided a number of issues relating to the calculation of damages, requested that the Parties' respective damages experts ("**Experts**"), recalculate damages on the basis of those findings and produce a new joint expert report on damages, and deferred the Parties' claims for interest and costs to the Final Award. In the Second Partial Award on Damages, the Tribunal determined the compensation owing to Gardabani through 31 December 2025 in the amount of USD 18,663,000, and to Telasi for the period through 30 June 2021, in the amount of USD 61,860,000. The Tribunal also deferred the quantification of compensation due to Telasi for the period from 1 July 2021 through 31 December 2025 ("**Forecast**

---

[6]  Georgia's official address and its address for receipt of notices under the 2013 Memorandum is: 7 Ingorokva Street, Tbilisi, Georgia, C-0034/ R-0028. The MOE's legal address set out in the Khrami SPA is 12 Chanturia St., Tbilisi 0108, Georgia. The SSB's registered address set out in the Khrami SPA is 12 Chanturia St., Tbilisi 0108, Georgia.

Period") to this Final Award pending receipt of further information and recalculations by the Experts relating to the effects of the Unbundling Regime which came into effect on 1 July 2021.

12.    The procedural developments since 23 November 2021 are summarized in the following paragraphs.

13.    On 17 January 2022, the Claimants requested that the Tribunal award additional damages to Gardabani on the basis that the assumption upon which the Experts had calculated compensation due to Gardabani tariffs from 1 January 2022 had changed ("**Claim for Additional Damages**"). The Claimants indicated that they were prepared to submit an explanation with supporting expert testimony in support of their request and suggested a timeframe for the filing of submissions from the Parties.

14.    On 24 January 2022, the Parties jointly requested an extension until 14 March 2022 to submit the Joint Expert Report on Telasi's losses in the Forecast Period from 1 July 2021 through 31 December 2025. On 25 January 2022, the Tribunal granted the extension requested.

15.    On 26 January 2022, counsel for the Respondents advised the Tribunal that they were seeking instructions regarding the Claimants' Claim for Additional Damages and that, in the meantime, they had no objection to the Claimants' proposed briefing schedule. On 27 January 2022, the Tribunal requested that the Respondents advise it of their position once counsel had received instructions.

16.    On 31 January 2022, the Claimants requested that the Tribunal provide them with a period of one month to make their submission in support of their Claim for Additional Damages. On 4 February 2022, counsel for the Respondents advised the Tribunal that they were still seeking instructions with respect to the Claimants' Claim for Additional Damages and had no objection in principle to the Claimants' request for additional time to make their submission in support of their

claim and were content with the period of one month from the date of the Claimants' submission to respond.

17.    On 7 February 2022, the Tribunal granted the Claimants until 7 March 2022 to make their submission on their Claim for Additional Damages and granted the Respondents until 7 April 2022 to provide their response.

18.    On 18 February 2022, the Tribunal requested an extension of the date for rendering the Final Award until 10 June 2022. On 24 February 2022, the SCC extended the date for the submission of the Final Award until 10 June 2022.

19.    On 7 March 2022, the Claimants filed their Submission in Respect of Additional Gardabani Losses, together with the Fifth Expert Report of Michael Peer and supporting materials.

20.    On 13 March 2022, the Parties jointly requested an extension until 22 March 2022 to submit the joint expert report on Telasi's losses during the Forecast Period (1 July 2022–31 December 2025). On 14 March 2022, the Tribunal granted the Parties' request. On 22 March 2022, the Parties jointly requested an extension until 24 March 2022 to submit the joint expert report and the Tribunal granted the Parties' request on the same date.

21.    On 24 March 2022, the Parties submitted the Fourth Joint Expert Report regarding the quantification of compensation owing to Telasi for the Forecast Period ("**JER4**"). The Parties also subsequently submitted their respective experts' updated models and accompanying exhibits.

22.    On 7 April 2022, the Respondents submitted their Response to the Claimants' Claim for Additional Damages. In their Response, the Respondents accepted that the tariffs in question had changed and suggested that the Parties' experts attempt to agree on the calculation of any additional damages by 15 May 2022. The Claimants accepted the Respondents' suggestion and

the Tribunal set the deadline for the submission of a new joint expert report ("**JER5**") on 16 May 2022.

23.     On 5 May 2022, the Tribunal requested from the SCC a new extension of the date for rendering the Final Award until 9 September 2022.  On 13 May 2022, the SCC granted the Tribunal's request and extended the deadline for rendering the Final Award until 9 September 2022.

24.     On 16 and 19 May 2022, the Parties jointly requested an extension of the deadline for submitting JER5 until 6 June 2022. On 20 May 2022, the Tribunal granted the Parties' joint request. Subsequently, the Parties jointly requested additional extensions, which the Tribunal granted.

25.     On 9 June 2022, the Parties submitted JER5 which set out the Experts' calculations relating to the Claimants' Claim for Additional Damages.

26.     On 13 June 2022, the Tribunal requested that the Parties provide their submissions on interest and their updated claims for costs by 30 June 2022.

27.     On 29 June 2022, the Parties jointly requested an extension of the deadline for submissions on interest and updated costs until 5 July 2022. On 30 June 2022, the Tribunal granted the extension requested.

28.     On 30 June 2022, the Claimants requested leave to submit in evidence two recent articles relating to the setting of Gardabani's tariffs in November 2022.

29.     On 5 July 2022, the Parties filed their respective submissions on interest and costs.

30.     On 8 July 2022, the Respondents submitted their Response to the Claimants' Request to Submit New Articles into Evidence. In their response, the Respondents submitted that the press articles that the Claimants sought to submit into evidence are not relevant to the issue of whether

the Khrami Companies' generation tariffs will be increased in November 2022. Nevertheless, the Respondents stated that although the request for admission of the articles in question came late in the proceedings, they had no principled objection to the introduction of the articles into the record.

31.    On 14 July 2022, the Tribunal accepted the Claimants' request and admitted the articles into the record.

## IV.    CLAIMANTS' APPLICATION IN RESPECT OF GARDABANI'S LOSSES

32.    In the First Partial Award on Damages, the Tribunal determined that the compensation due to Gardabani for the period of 1 January 2022 to 31 December 2025 should be calculated on the basis that the NERC would adjust the Khrami Companies' tariffs in accordance with the terms of clauses 2.1 and 2.2 of Appendix 1 of the Khrami SPA as interpreted by it.[7] In accordance with the Tribunal's directions, the Parties' Experts reached an agreed calculation on a free cashflow to equity ("**FCFE**") basis, using a valuation date of 31 December 2020. In their calculations, the Experts assumed that starting from 1 January 2022 the NERC would adjust the Khrami Companies' tariffs in accordance with the Khrami SPA, which would involve the application of the new-base tariffs (2.3 tetri/kWh for Khrami-1 and 3.67 tetri/kWh for Khrami-2) provided for in the Khrami SPA as of 1 January 2022 (the "**New Base Tariffs**"), as adjusted on the basis of a decrease in the value of the GEL against the USD and against the JPY. On the basis of the foreign-exchange-based adjustments, the Experts assumed in their third joint expert report, dated 28 October 2021 ("**JER3**") that the adjusted Khrami-1 tariff would be 4.79 tetri/kWh and the Khrami-

---

[7] First Partial Award on Damages, ¶¶ 93-97, 168(a)(b).

2 tariff would be 7.07 tetri/kWh (the "**Assumed Tariffs**"). This resulted in the final calculation of damages to Gardabani in JER3 as follows:

| Tetri / kWh | 2013-2021 | Jan-Oct 2022 | Nov-Dec 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| **Khrami-1** | | | | | | | |
| But-For Scenario JER 3 | | 4.27 | 4.79 | 4.79 | 4.79 | 4.79 | - |
| Actual Scenario JER 3 | | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | - |
| Gardabani damages related to Khrami-1, USD 000's | **6 209** | **466** | | | | | **6 676** |
| **Khrami-2** | | | | | | | |
| But-For Scenario JER 3 | | 6.51 | 7.26 | 7.26 | 7.83 | 7.88 | - |
| Actual Scenario JER 3 | | 7.07 | 7.26 | 7.26 | 7.83 | 7.88 | - |
| Gardabani damages related to Khrami-2, USD 000's | **10 921** | **1 066** | | | | | **11 988** |
| **Total Gardabani damages, USD 000's** | **17 131** | **1 533** | | | | | **18 663** |

Source: MP 5, table 2.2 at p.6

33.    In its Second Partial Award on Damages, dated 23 November 2021, the Tribunal accepted the Experts' agreed calculation and awarded compensation to Gardabani in the amount of USD 18,663,000.

34.    In December 2021, the Khrami Companies applied to the NERC to set tariffs from 1 January 2022 at the level equal to the Assumed Tariffs. The NERC did not accept the Khrami Companies' applications. In its Resolution No. 2, dated 24 February 2022, the NERC increased the tariff of Khrami-2 on account of the devaluation of the GEL against the JPY from 3.8 tetri/kWh

to 4.15 tetri/kWh.[8] However, this increased tariff was lower than the Assumed Tariff of 7.07 tetri/kWh used by the Experts in their calculations.

35.    The NERC did not adjust the tariffs of Khrami-1 or Khrami-2 in respect of the GEL/USD exchange rate because it decided that the date for the adjustment of the tariffs on that basis is 1 November 2022.[9]

36.    Accordingly, the Khrami Companies' tariffs remained below the Assumed Tariffs used by the Parties' Experts in JER 3 and accepted by the Tribunal in fixing its award of damages in the Second Partial Award on Damages.

37.    In JER5, the Experts revised their assumption and calculated the additional damages to Gardabani. They agree on the calculation for the period from 1 January 2022 to 31 October 2022, but disagree with respect to the period from 1 November 2022 to 31 December 2025. The basis for the Experts' difference is whether the tariffs will remain at the current levels set by the NERC until 31 December 2025.

38.    With respect to the period from 1 January to 31 October 2022, the Experts agree that since the NERC has approved the tariffs for that period, no further adjustments to the tariffs are expected to take place. On that basis, they have calculated and agreed the additional damages owed to Gardabani in the amount of USD 2,241,000.

39.    With respect to the period from 1 November 2022 to 31 December 2025, Mr. Peer assumes that the NERC will not make further adjustments to the Khrami Companies' tariffs, which will remain at the currently approved levels until December 2025. Therefore, according to him, the

---

[8]  NERC Resolution No.2, dated 24 February 2022, BM-60. The NERC's Resolution is effective for the period 1 March 2022–31 December 2024. Nevertheless, in paragraph 1.3 of JER5, the Experts state that the period covered runs until 31 December 2025.

[9] NERC Letter of 8 December 2021, BM-62; Explanatory Notes to Resolution No. 2, BM-61.

Actual Scenario used in the calculation of damages should reflect the currently approved tariffs of the Khrami Companies for the entire period remaining until 31 December 2025. On the other hand, Dr. Moselle is of the view the NERC will continue to adjust the Khrami Companies' tariffs from 1 November 2022 until 31 December 2025. Therefore, in his view, the Actual Scenario should assume adjustments to the currently approved tariffs from 1 November 2022 according to two possible scenarios.

40.     The Experts agree that if from 1 November 2022 onwards the NERC revises its current Resolution No. 2 so as to adjust the tariffs of both of the Khrami Companies in accordance with the Tribunal's directions in its Partial Award, then the additional damages due to Gardabani amount to USD $2,241,000. They also agree that if from 1 November 2022 onwards, the NERC does not adjust the tariffs of the Khrami Companies in accordance with the Tribunal's directions and the tariffs remain at their currently approved levels until 31 December 2025, then the additional damages due to Gardabani (cumulatively from 1 January 2022 until 31 December 2025) amount to USD 8,974,000.[10]

### A.     Mr. Peer's Approach

41.     In Mr. Peer's view, neither expert is able to reliably estimate the approach that the NERC will apply in relation to the USD and JPY-based adjustments. Based on the NERC's practice in light of the Tribunal's directions in its partial awards, Mr. Peer considers it reasonable to assume that the NERC will not adjust the Khrami Companies' current tariffs until 31 December 2025. In this regard, Mr. Peer refers to the following:

---

[10] JER5, p. 4. The Experts also agreed to use 31 December 2020 as the valuation date for the additional damages as this was the date fixed by the Tribunal for the purposes of JER3.

a)  The NERC's refusal to adjust the Khrami Companies' tariffs as of 1 January 2022 to the level provided in the Second Partial Award on Damages;

b)  The NERC's decision to apply a JPY-based adjustment to Khrami-2's tariffs effective as of 1 March 2022, which is inconsistent with the adjustment of tariffs provided for in the Khrami SPA, the Tribunal's directions or the NERC's previous practice;

c)  In calculating the JPY-based adjustment to Khrami-2's tariffs from 1 March 2022, the NERC used an average method as opposed to the Snapshot rates that the Tribunal directed should be applied.

42.    According to Mr. Peer, assuming that the NERC will not adjust the Khrami Companies' tariffs until 31 December 2025 will not result in an overestimation of additional damages since the NERC will be able to keep the Khrami Companies' tariffs at the currently approved level throughout the relevant period. Further, in his view, assuming a change in the NERC's practice to comply with the Tribunal's prior directions would require further applications to the Tribunal in the event the NERC does not, in fact, follow the Tribunal's directions precisely.[11]

**B.    Dr. Moselle's Approach**

43.    Dr. Moselle considers it unreasonable to assume that the NERC will not apply any further adjustments to the Khrami Companies' tariffs until 31 December 2025.

44.    With respect to the GEL/JPY-based adjustments to Khrami-2's tariffs, Dr. Moselle states that the NERC has consistently applied this adjustment, including the latest adjustment made in

---

[11] JER5, pp. 4-5.

NERC Resolution No. 2, dated 24 February 2022. By way of these adjustments, the NERC modified the tariffs that it had previously approved until December 2025 for Khrami-2. On that basis, Dr, Moselle sees no reason to assume that the NERC will not apply further JPY-based adjustments (using average exchange rates).[12] With respect to the USD-based adjustments, Dr. Moselle states that the NERC denied the Khrami Companies' applications requesting adjustments as of 1 January 2022 because the adjustment is not required to be made until 1 November 2022.[13]

45.     In Dr. Moselle's view, it is premature to rule out the possibility that the NERC will not apply USD-based adjustments to the tariffs of the Khrami Companies on 1 November 2022.

46.     Dr. Moselle calculated additional damages in two scenarios. In each of these, he assumed that the adjustments the NERC will make to the Khrami Companies' tariffs will be calculated on the basis of average exchange rates as has been its practice, contrary to the approach directed by the Tribunal to use the Snapshot rates.[14] Dr. Moselle described his two possible scenarios as follows:

> a) **Scenario 1**: Assumes that the NERC only applies the GEL/JPY-based adjustments, calculated on the basis of average exchange rates. In this scenario total additional damages to Gardabani amount to USD 8,836,000 (including the USD 2,241,000 for the period 1 January 2022 to 31 October 2022 agreed by the Experts).

---

[12]     JER5, pp. 5-6.

[13]     JER5, p. 5; Explanatory Notes to Resolution No. 2, BM-61; NERC Letter of 8 December 2021, BM-62. The Adjustment Date of 1 November 2022 is reflected in the Khrami SPA in Annex #1, Clause 2.2.

[14]     JER5, p. 6. According to Dr. Moselle, it is reasonable to expect that the NERC will continue applying this approach in its future calculation of adjustments. If this is correct, then the additional damages of USD 2,241,000 agreed by the Experts, calculated on the basis that the NERC would calculate adjustments in November 2022 using the Snapshot rate, would increase.

b) **Scenario 2**: Assumes that the NERC applies both GEL/JPY-based and GEL/USD-based adjustments, both calculated on the basis of average exchange rates. In this scenario, the total additional damages to Gardabani amount to USD $3,496,000 (including the USD $2,241,000 for the period 1 January 2022 to 31 October 2022 agreed by the Experts).[15]

47.    Dr. Moselle explains that the difference between the two scenarios is the assumption in respect of whether the NERC will apply USD-based adjustments as of 1 November 2022. According to Dr. Moselle, while the NERC has not yet excluded the possibility that it will apply a USD-based adjustment as of that date, a conservative estimate of the additional damages if it does not do so is reflected in his first scenario: additional damages of USD 8,836,000.[16]

C.    **Tribunal's Analysis**

48.    Having considered the Experts' views and calculations set out in JER5 in light of its previous Partial Awards on Damages, the Tribunal has concluded that the additional damages calculated by Dr. Moselle in his Scenario 1 (USD 8,836,000) should be accepted. In the Tribunal's view, the approach adopted in this scenario provides greater certainty and finality.

49.    In this regard, the Tribunal notes that the NERC is an independent agency which is not bound by the terms of this Award. The NERC's approach in calculating the JPY-based adjustment to Khrami-2's tariffs effective as of 1 March 2022 using an average method is not consistent with the Tribunal's directions in its previous Partial Awards and related separate directions. In light of this, the Tribunal is not sufficiently confident that the NERC will adjust the Khrami Companies'

---

[15] JER5, p. 6.

[16] JER5, p. 6.

tariffs in the remaining period from 1 November 2022 to 31 December 2025 to adopt Dr. Moselle's Scenario 2 (which assumes that the NERC will apply both GEL/JPY-based and GEL/USD-based adjustments consistent with the Tribunal's directions). Accordingly, the Tribunal finds it more prudent to calculate damages on the basis that the NERC will not apply a USD-based adjustment to the Khrami Companies' tariffs consistent with the Tribunal's directions as of 1 November 2022. The Tribunal accepts Mr. Peer's opinion that this will not result in an overestimation of additional damages since the NERC will control the Khrami Companies' tariffs going forward and may choose to maintain these at the currently approved level until 31 December 2025.

50.    The remaining issue is whether the NERC will continue applying a JPY-based adjustment to Khrami-2's tariffs going forward until 31 December 2025. Mr. Peer says there is no basis to assume that the NERC will do so, while Dr. Moselle says that the NERC has consistently applied JPY-based adjustments, the latest being in NERC Resolution No. 2 of 24 February 2022. In the Tribunal's view, it is reasonable to expect that the NERC will continue making JPY-based adjustments to Khrami-2's tariffs on the basis of average exchange rates, as it has done to date. Accordingly, the Tribunal finds that Dr. Moselle's Scenario 1 should be adopted. This yields a calculation of additional damages payable to Gardabani in the amount USD 8,836,000.[17]

## V.    COMPENSATION OWED TO TELASI FOR THE FORECAST PERIOD

51.    In JER4, the Experts identified two principal disagreements between them. The first disagreement relates to the appropriate valuation date for the calculation of damages owed to Telasi

---

[17] In reaching this conclusion, the Tribunal has considered the two press articles which the Claimants submitted on 21 July 2022, C-0258 and C-0259. In the Tribunal's view, the articles are of limited relevance and been accorded no weight.

Page 15
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

for the period from 1 July 2021 to 31 December 2025; the second disagreement relates to the appropriate approach for calculating damages and whether all components of free cash flow to firm (FCFF) or only four components of FCFF should be used. The Experts summarized the effect of their respective approaches to these two issues as follows:

*Telasi and Inter RAO damages for the period from 1 July 2021 to 31 December 2025*

|  | **Mr Peer** | **Dr Moselle** |
|---|---|---|
| Valuation date | 31 Dec 2021 | 31 Dec 2020 |
| Approach for calculation | Full FCFF | FCFF Components |
| **Telasi damages (USD 000's)** | **60 665** | **22 640** |
| **Inter RAO damages (USD 000's)** | **32 921** | **12 493** |

[18]

### A.  Disagreement 1: Valuation Date

52.    The Experts differ on whether damages for the period from 1 July 2021 to 31 December 2025 should be calculated as of 31 December 2020 or 31 December 2021. According to Mr. Peer, the actual financial data for the last six months of 2021 ("**2H 2021**") of Telasi and Telmico should be taken into account in the calculation of damages. This leads to the use of 31 December 2021 as the valuation date.[19] Dr. Moselle, on the other hand, considers that the appropriate valuation date is 31 December 2020 and that it is unnecessary to take into account actual financial data for Telasi and Telmico for 2021.[20]

---

[18] JER4, ¶ 2.8. The Experts' calculations were provided on the basis of their approach to the valuation date and the components of FCFF. They did not provide a calculation of damages using the valuation date or the components of FCFF used by their counterpart or otherwise challenge the accuracy of those calculations.

[19] JER4, ¶ 2.4(a).

[20] JER4, ¶ 2.4(b).

i.    ***Mr. Peer's Approach***

53.    Mr. Peer summarized his approach as follows:

> — *Cash flows in the Actual scenario are calculated as of 31 December 2021 for both Telasi and Telmico: (1) cash flows for 2H 2021 are taken from audited financial statements and (2) cash flows for 2022-2025 are forecasted using actual data for 2H 2021 from the respective financial statements. I believe that the Telasi damages (as calculated with due regard to the Unbundling Regime) cannot be reliably calculated as of 31 December 2020 due to a lack of data since most of the knowledge about the Unbundling Regime only became available in 2021. This is also consistent with the practice of using the most recently available information for the calculation of the damages. It is also consistent with prior practice of using the most recently available information as to expectations of the future whereas using the NERC projections would be relying upon outdated projections prepared earlier.*

> — *But-For scenario is calculated as of 31 December 2020 as all elements of the calculations were agreed with Dr Moselle in the Second Joint Expert Report, so it is easier to stick with the agreed position. I explain below why updating the valuation date for the But-for scenario is problematic and it is preferable to keep the existing valuation date for same.*

> *I do not use any actual information for 1H 2021 in my calculations in both the Actual and But-For scenarios, as damages for 1H 2021 were already included in the Second Partial Award.*

> *1.1. Actual scenario*

> *From the valuation perspective the Actual scenario should be calculated as of 31 December 2021 as both Experts and Tribunal agree that there was not enough information available regarding the Unbundling Regime as of 31 December 2020:*

> — *On 29 June 2021 NERC issued resolutions in relation to key uncertainties of the Unbundling Regime, including the Telasi and Telmico tariffs and underlying tariff methodology. In 2021 NERC also introduced some future plans for development of the Unbundling Regime such as details about the launch of a power exchange from 1 March 2022.*

> — *The new Unbundling Regime has only operated since 1 July 2021 so using actual data for 2H 2021 allows the Experts to understand how it operates in practice.*

> *1.2. But-For scenario*

> *To avoid any contradictions with the Partial Award and other Directions of the Tribunal, I have not updated the But-For scenario as of 31 December 2021.*

> *Technically, the But-For scenario should be also calculated as of 31 December 2021 which would include updates of the exchange rates, macroeconomic forecasts and sales volumes. However, an update of the But-For scenario as of 31 December 2021 has a potential contradiction with the Partial Award in relation to Telasi damages for 1H 2021:*

*— In the Third Joint Expert Report the Experts agreed that there is no other way to calculate cash flows in the But-For scenario for a half of the year other than to assume that it equals 50% of the cash flows for the whole year. Such an approach ignores seasonal factors but is still appropriate because Telasi is entitled to compensation for damages for both 1H 2021 and 2H 2021. The split into two awards was a technical exercise.*

*— If the cash flows for all of 2021 in the But-For are updated, damages for 2H 2021 would not be consistent with the logic described above and therefore damages for 1H 2021 would need to be updated as well. However, the update will consider any over/under performance of Telasi in 1H 2021 which is ignored in the Actual scenario.*

*Therefore, a potential solution for this situation is to calculate the damages of Telasi for all of 2021 as of 31 December 2021 and set-off the amount in the Partial Award for 1H 2021 against the calculated amount. I have not done so as the Tribunal has not instructed such a calculation although such an approach would result in a more accurate estimate of the Telasi Damages.*[21]

54.    Mr. Peer gives a number of reasons for his disagreement with Dr. Moselle's approach. These include the following:

a) Dr. Moselle uses different sources for Telasi's Distribution Tariffs in the Actual Scenario. In this regard, Dr. Moselle uses a valuation date of 31 December 2020 (which is the same valuation date as in JER2, dated 21 June 2021), and the tariffs set out in NERC Resolution No. 83 dated 29 December 2020 which set tariffs until 31 December 2025. However, he has changed the source of Telasi's tariffs for the period from 1 July 2021 to 31 December 2025, using the tariffs that the NERC calculated in its December 2020 model which was not set out in NERC Resolution No. 83. Although in Resolution No. 27 dated 29 June 2021, the NERC set tariffs similar to those provided in the NERC's model of December 2020 used by Dr. Moselle, this could not have been known as of the

---

[21] JER4, pp. 5-6. This alternative to Mr. Peer's approach would involve re-estimating damages for all of 2021 and setting off the amount already awarded in the Second Partial Award on Damages for 1H 2021 in the Tribunal's award for the balance of 2021. Mr. Peer states that although this alternative approach would result in a more accurate estimate of Telasi's damages, he has not calculated damages under this approach since the Tribunal has not requested it.

valuation date of 31 December 2020. According to Mr. Peer, the use of *ex-post* information is not permissible under international valuation standards. According to Mr. Peer, a consistent approach requires using one of two options: tariffs from NERC's Resolution No. 83 if the valuation date is set at 31 December 2020; or, NERC's Resolution No. 27 from 29 June 2021 which effectively means the valuation date must be set at 31 December 2021. Mr. Peer uses the second option, which, according to him, allows for the reliable estimation of the effects of the Unbundling Regime.[22] Dr. Moselle's approach affects damages for 1H 2021 which have already been awarded by the Tribunal in the Second Partial Award on Damages. In JER3, Dr. Moselle calculated Telasi's damages for the first six months of 2021 ("**1H 2021**") using Telasi's Distribution Tariffs set in Resolution No. 83 dated 29 December 2020. In JER4, Dr. Moselle changed the source of the tariffs to use the preliminary tariffs from NERC's model prepared in December 2020. This results in the calculation of a higher-than-average distribution tariff used in JER3, while the valuation date remains the same. According to Mr. Peer, this change affects the total damages for 2021 and automatically affects the damages awarded for 1H 2021. According to Mr. Peer, Dr. Moselle continues to use the same valuation date of 31 December 2020 as was used in JER3, but also uses information which

---

[22] JER4, pp. 5-6.

became available in 2021 for both Telasi and Telmico. According to Mr. Peer, his approach does not affect damages awarded for 1H 2021.[23]

b) Mr. Peer disagrees with Dr. Moselle's view that the Tribunal determined the appropriate valuation date for the assessment of future damages in its Second Partial Award on Damages when it determined that the appropriate date was 31 December 2020. According to Mr. Peer, the Second Partial Award on Damages provided directions in relation to the valuation dates for historical damages (31 March 2013–31 December 2020), only. In his view, the Tribunal selected 31 December 2020 as the valuation date for this period since there were limitations related to updates of the But-For scenario as of mid-year 2021. This is not the case for damages relating to the Unbundling Regime for which the valuation date of 31 December 2021 is appropriate and does not contradict the Tribunal's decision in relation to historical damages.[24]

c) Dr. Moselle's approach of using the valuation date of 31 December 2020 unduly restricts consideration of all of the effects of the Unbundling Regime, including: the launch of the power exchange in 2022 in accordance with the NERC's expectations as of 31 December 2021; one-off transactions in Telasi's and Telmico's financial statements related to the transition to the Unbundling Regime; and the effect of OPEX and CAPEX of Telasi and Telmico under the Unbundling Regime.[25]

---

[23] JER4, p. 7.

[24] JER4, pp. 7-8.

[25] JER4, p. 8.

Page 20
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

55.    In response to Dr. Moselle's criticism of his approach, Mr. Peer made a number of points. These can be summarized as follows:

a)  The criticism regarding the possibility of double recovery is purely hypothetical. Further, there is an equal chance of under recovery as over recovery of costs since neither the Experts nor the NERC know the future and cannot build an entirely correct forecast. According to Mr. Peer, his methodology allows for resolution of this issue since the NERC can compensate for any over or under performance in future periods.[26]

b)  Use of a 31 December 2020 valuation date creates a higher chance of double recovery or under recovery of costs since Dr. Moselle's calculations use the NERC's forecasts as of June 2021. According to Mr. Peer, his model takes into account the actual data for 2H 2021 and, therefore, considers any deviations in order to ensure correct withdrawals or compensations in 2022–2025.[27]

c)  Regarding the criticism relating to potential double compensation of costs, this is said to result from a potential difference between the actual data and the planned data used to calculate the tariffs. The potential double recovery raised by Dr. Moselle is said to occur as a result of including a deviation between costs in the damages calculation models and the NERC compensating later for the same deviations in subsequent periods. However, both experts use the tariff-setting methodology to estimate tariffs in the forecasted period in both the But-

---

[26] JER4, p. 8.

[27] JER4, pp. 8-9.

For and Actual scenarios. Since the methodology takes into account deviations between actual and planned data in future tariffs, the potential for double recovery when setting a tariff for the next period is avoided. Further, and in any event, Mr. Peer considers that actual information is always more reliable than any forecast. With respect to the recovery of costs related to the launch of the power exchange, Mr. Peer is of the view that Dr. Moselle underestimates damages since he takes into account a potential compensation component in terms of future revenue via tariff increases but ignores the additional financing costs which are newly imposed and not compensated.[28]

d) Mr. Peer does not accept that his usage of average cost of electricity purchases from the NERC's model dated December 2020 is inconsistent with his selection of the valuation date of 31 December 2021. Although the NERC updated its December 2020 model in June 2021, Mr. Peer has used an average cost of electricity purchases from the model prepared in December 2020 because the inputs in that model are equal to the inputs which influence the average cost of electricity purchases in the June 2021 model. Although it would be possible to calculate the average cost of electricity purchases using inputs from the model prepared in June 2021, such an approach would be overly complicated and would ultimately arrive at the same result. Therefore, the use of an average cost of electricity purchases from the model prepared in December 2020 is correct and consistent. Using a valuation date of 31 December 2020, as Dr. Moselle

---

[28] JER4, p. 9.

Page 22
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

does, does not permit the use of NERC's Resolution No. 27 and its model dated 29 June 2021 to justify Dr. Moselle's assumptions.[29]

### ii.     *Dr. Moselle's Approach*

56.     Dr. Moselle summarized his approach as follows:

*My approach for calculating damages as of 31 December 2020 is based on the following:*

*- For Telasi in the But-For scenario (i.e., for the bundled distribution and retail activities) I use macroeconomic, electricity cost, tariffs and volumes data that was available as of 31 December 2020.*

*- For Telasi in the Actual scenario (i.e., for the distribution activity only) I also use macroeconomic, electricity cost and volumes data that was available as of 31 December 2020. For Telasi distribution tariffs, I use the tariffs that, according to the NERC's calculation from December 2020, were planned to be applied in the period 2H 2021-2025.*

*- For Telmico in the Actual scenario (i.e., for the retail activity only) I use macroeconomic and volumes data that was available as of 31 December 2020 but use the electricity cost and tariffs that the NERC used for the setting of Telmico's tariffs in June 2021.*

*1.1. Distribution of electricity*

*I believe that using information as of 31 December 2020 for the distribution activity in both But-For and Actual scenarios is the most appropriate approach to calculate Telasi's and Inter RAO's damages for the Forecast Period because:*

*- It is consistent with the Tribunal's decision from the Second Partial Award (para. 53) that "the appropriate valuation date for Telasi's and Inter RAO's damages is 31 December 2020".*

*- Also according to the Second Partial Award (para. 51), "In the Tribunal's view, the valuation date should be a date in respect of which relevant data is available for the Actual and But-For scenarios. As the latest updated forecasts for Telasi's But-For scenario are those dated 31 December 2020 and updated forecasts of 30 June 2021 are not available, the Tribunal prefers the use of 31 December 2020 as the valuation date." As of the current date, the latest forecasts from the NERC about Telasi still are those made as of December 2020, which are the same that were used in the calculation of Telasi's damages in the period from March 2013 to June 2021.*

*- The current distribution tariffs that apply to Telasi were calculated by the NERC using information (i.e., macroeconomic, cost and volume data) that was available as of 31 December 2020 (source: Exhibit BM-44). As I explain in point 3 below, basing the Actual*

---

*scenario on the information that was used to calculate current Telasi distribution tariffs is important to prevent the possibility of double compensation of costs.*

*1.2. Retail of electricity*

*I believe that the use of tariffs and cost data for Telmico as of June 2021 in the Actual scenario is the most appropriate way to calculate damages because:*

*- It is consistent with the Tribunal's decision from the Partial Award (para. 85) to defer its final decision "until it has received additional information and submissions from the Parties regarding the Unbundling Regime and its effect", since this information was not available as of 31 December 2020.*

*The current retail tariffs that apply to Telmico were calculated by the NERC using cost information that was available as of June 2021 (source: Exhibit BM-52). As I explain in point 3 below, basing the Actual scenario on the information that was used to calculate actual Telmico retail tariffs is important to prevent the possibility of double compensation of costs…*

*8. Summary of my position*

*In summary, I consider that 31 December 2020 should be used as date of valuation mainly because:*

*- It makes the current calculation of damages consistent with those already decided by the Tribunal in this arbitration.*

*- It prevents that Telasi and Telmico get compensated in the final award for costs that they will, in addition, recover via future adjustments in their tariffs.*

*- To prevent potential biases in the calculation of damages, both But-For and Actual scenarios need to be expressed as of a same date and using the same sources of information. If the date of valuation were 31 December 2021, then the But-For scenario would need to be recalculated as of this date. This process is likely to be time consuming and would likely require the Tribunal to decide on the potential disagreements that the Experts may have, particularly on the sources of information to use given that the latest available forecasts from the NERC (which have been used until now) have been calculated as of 31 December 2020.*

*- My source for Telasi's distribution tariffs does not require the use of ex-post information as claimed by Mr Peer and does not impact the calculation of damages for 1H 2021. To the contrary, current approach is consistent with the approach that both Experts followed in the calculation of damages for 1H 2021 and following the same approach is the only way to obtain damages for 2H 2021 that correctly reflect the effect of Telasi's distribution tariffs for the whole year 2021.[30]*

57.    Dr. Moselle's comments on Mr. Peer's analysis are as follows:

---

[30] JER4, pp. 10-11, 15-16.

a) Mr. Peer only uses information (macro-economic forecasts and financial data) as of 31 December 2021 in the Actual Scenario. However, Mr. Peer's But-For scenario continues to be based on information as of 31 December 2020. Most of the parameters used in the calculation of the But-For scenario as of 31 December 2020 came from the forecast that the NERC used in its calculation of Telasi's Distribution Tariffs until 2025. There are no more recent forecasts sourced from the NERC to update the But-For scenario. Mr. Peer bases his Actual Scenario as of 31 December 2021 on various forecasts provided by Telmico or Telasi. The use of different sources of information to calculate the But-For and Actual scenarios creates inconsistencies and potentially biases the calculation of damages.[31]

The use of 31 December 2021 as the valuation date results in an estimate of damages owing to Telasi for the period from 1 July 2021 to 31 December 2025 that is not directly comparable or additive to the damages that the Tribunal has already awarded for the period from 31 March 2013 to 30 June 2021, using a valuation date of 31 December 2020. Further, the use of 31 December 2021 as a valuation date would require updating the sources of macro-economic forecasts, which has already been decided by the Tribunal in the First Partial Award on Damages (paragraph 168(j), (k)).

The use of 31 December 2021 as a valuation date would imply that that year forms part of the Historical Period, which contradicts the Tribunal's definition

---

[31] JER4, p.11.

of that period, which, according to the Second Partial Award on Damages (paragraph 28) ends at 31 December 2020.

Dr. Moselle disagrees with Mr. Peer's statement that using actual information for 2H 2021 is consistent with the practice of using the most recently available information for the calculation of damages. In this regard, he notes that the Tribunal rejected the use of actual information for 1H 2021 when it awarded damages for the period from 31 March 2013- 30 June 2021. Although Mr. Peer is of the view that using the NERC's projections instead of forecasted data as of the second-half of 2021 would rely on earlier prepared projections, his calculations still rely on the NERC's forecasts of electricity volumes which were made as of December 2020. As a result, Mr. Peer's approach is inconsistent because it mixes different sources of information (e.g., Telasi and Telmico for certain costs, and the NERC for electricity volumes until 2025), as well as different dates for forecasts (e.g., second-half of 2021 for certain costs and December 2020 for electricity volumes).[32]

b) Using a valuation date of 31 December 2021 may result in double compensation of costs since the regulatory system that applies to both companies periodically provides for corrections to their approved tariffs to compensate for differences between actual data and the data used to calculate the tariffs (planned data). As a result, if either company's actual costs of electricity purchases are higher than those foreseen when the tariffs were set, their future tariffs will be adjusted to

---

[32] JER4, p. 11.

Page 26
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

compensate for the additional costs. Therefore, if damages are calculated using actual financial data, the companies would receive double compensation for the additional costs of purchasing electricity. In this regard, Dr. Moselle refers to Telmico's financial statements which state that the increase in current costs related to electricity purchase and to additional finance required will be compensated in the next tariff period. Basing the Actual Scenario on the same information that was available when the NERC calculated Telasi's current Distribution Tariffs (December 2020) and Telmico's current Retail Tariffs (June 2021), limits the possibly of double or under recovery of costs. Dr. Moselle does not accept that in this case there is an equal chance of under or over recovery of costs in any particular period. In his view, over recovery is a more likely scenario because Mr. Peer's calculations include, for example, actual CAPEX costs for Telmico, which will be recovered by way of the depreciation component of its tariffs.[33]

58.    In response to Mr. Peer's comments on his approach, Dr. Moselle comments as follows:

a)  Using the tariffs from the NERC's December 2020 model for the period from 1 July 2021 to 31 December 2025 instead of the tariffs approved by Resolution No. 83 from 29 December 2020 is appropriate and does not rely on information that became known *ex-post*. The NERC used its December 2020 model to calculate Telasi's Distribution Tariffs for the period of 2021-2025. For the

---

[33] JER4, pp. 11-13.

period from 1 January 2021 to 30 June 2021, the tariffs in the NERC's model are the same as those approved by Resolution No. 83 of 29 December 2020.

The NERC's December 2020 model foresaw that Distribution Tariffs would be increased in the period from 1 July 2021 to 31 December 2023 to account for an adjustment in the cost of electricity purchases. The explanatory notes to Resolution No. 83 of 29 December 2020 expressly stated that these tariffs would be increased to reflect the adjustment in the cost of electricity. Therefore, this fact was known as of 31 December 2020 and does not involve the use of *ex-post* information in breach of international valuation standards.[34]

b)  With respect to Mr. Peer's criticism that his approach effectively impacts damages for 1H 2021, which have already been awarded by the Tribunal because in the calculation of damages from JER3 he (Dr. Moselle) had assumed that the Distribution Tariffs approved for 1H and 2H 2021 would be equal, Dr. Moselle maintains that his approach is correct. In this regard, he says that the approach adopted in JER3 was agreed between the Experts and, therefore, Mr. Peer's calculations in JER3 follow the same approach regarding Telasi's Distribution Tariffs for 2021. In JER3, the Experts estimated damages for 1H 2021 by calculating damages for the entire year and then dividing damages by using the average proportion of sales in the first semester (equal to 50.54%).

---

[34] JER4, p. 13. Dr. Moselle notes that in its Resolution No. 27, the NERC confirmed the increase in Distribution Tariffs for the period from 1 July 2021 to 31 December 2023. The explanatory notes to this Resolution confirm that the tariff increase was based on basically the same information contained in the NERC's model from December 2020. Although the increase approved in June 2021 was slightly higher than the one calculated as of December 2020, Dr. Moselle states that he used the lower tariffs that were foreseen as of December 2020 in his calculations. As a result, Dr. Moselle maintains that he did not use Resolution No. 27 in his calculations as alleged.

While this approach would provide only an approximation of the exact value of damages corresponding to 1H 2021, any deviation would be automatically corrected in the calculation of damages for 2H 2021 provided a consistent approach in the calculation of damages is adopted. To be consistent, the Distribution Tariffs for 2H 2021 should be assumed to apply to the whole of the year so that when taken together, damages for 1H 2021 and 2H of the year reflect the correct distribution tariff for the entire year and then divide the annual damages by the proportion of sales in the second semester (equal to 49.46%). According to Dr. Moselle, this is the approach that he followed in his calculations in JER4.

c)  With respect to Mr. Peer's view that the But-For scenario should be updated to 31 December 2021, Dr. Moselle is of the view that this would be impractical and unnecessary. In this regard, many of the parameters that were used to calculate the But-For scenario as of 31 December 2020 were sourced from the NERC's December 2020 model which it used to calculate Telasi's Distribution Tariffs for the period 2021-2025. As there are no more recent updates of NERC's 2020 model, an update would require the Experts to use alternative sources or assumptions and would require the Tribunal to potentially decide on the disagreements that would be likely to arise. Further, since the Tribunal has decided that damages for the first part of the forecast period (1 January 2021-30 June 2021) are calculated using 31 December 2020 as the valuation date, using 31 December 2021 for the remaining part of the forecast period, from 1 July 2021 to 31 December 2025, would create an unnatural break in the

calculations. Dr. Moselle disagrees with Mr. Peer's proposed solution to calculate Telasi's damages for all of 2021 and set off the amount awarded by the Tribunal in the Second Partial Award on Damages against that amount. In his view, this approach calculates damages for 2021 as of 31 December 2021, which is inconsistent with the Tribunal's decision to calculate damages for 1H 2021 as of 31 December 2020. Further, if damages are calculated as of 31 December 2021, they are not directly comparable to the damages in the Second Partial Award on Damages and, therefore, the portion corresponding to 1H 2021 (calculated as of 31 December 2020) cannot be directly set off against an amount calculated as of 31 December 2021. In Dr. Moselle's view, the simpler solution is to continue calculating damages as of 31 December 2020.

d) Dr. Moselle disagrees with Mr. Peer's critique that his approach does not account for the effects of the Unbundling Regime and that 31 December 2021 is a better valuation date to fully account for the effects of the Unbundling Regime. With respect to the additional financial costs to Telmico attributable to the launch of the power exchange, these will be compensated by way of a tariff adjustment. Contrary to Mr. Peer's view, Dr. Moselle states that the applicable tariff-setting methodology for Telmico expressly compensates Telmico for the financing costs themselves. Further, as of 31 December 2021, the power exchange had not been launched, so that the use of the later valuation date provides little additional information about its effects on Telmico.

With respect to one-off transactions in Telasi's and Telmico's financial statements relating to the transition to the Unbundling Regime, Dr. Moselle is

of the view that Mr. Peer has not provided adequate detail of these. Further, from his review of Telasi's and Telmico's financial statements, Dr. Moselle is of the view that some of the transactions in question refer to intra-group transactions between Telasi and Telmico that cancel out when considered as a group. For example, with respect to the GEL 5 million inter-group loan from Telasi to Telmico as a result of the Unbundling, it should not affect the calculation of damages since, while it corresponds to an outflow from Telasi, it corresponds to an inflow to Telmico. Therefore, in the calculation of damages for both companies, the transaction cancels out and does not affect damages.

With respect to the OPEX and CAPEX of Telasi and Telmico under the Unbundling Regime, Dr. Moselle is of the view that since his calculation of damages is based on the planned costs that the NERC used to set the tariffs, corrections will be applied to future tariffs if actual costs differ from the planned ones. The explanatory notes to the NERC's tariff decisions indicate that the tariffs are calculated on the basis of information provided by Telasi and Telmico.[35]

### iii.    *The Tribunal's Analysis*

59.    Having considered the Experts' views set out in JER4 together with their supporting exhibits in light of its previous Partial Awards on Damages, the Tribunal prefers Dr. Moselle's

---

[35] JER4, pp. 14-15.

Page 31
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

approach and the use of 31 December 2020 as the valuation date for damages during the forecast period.

60.      In the Tribunal's view, the use of this date is consistent with its previous decision regarding the appropriate valuation date for Telasi's damages in the Historical Period. The latest available forecasts for Telasi's But-For scenario remain those dated 31 December 2020, which are the same that were used in the calculation of damages to 30 June 2021. Further, Telasi's current Distribution Tariffs were calculated by the NERC using information available at that date.

61.      With respect to Telmico, the Tribunal accepts that the use of tariffs and costs data available at the end of June 2021 when the Unbundling Regime came into effect is appropriate in light of the fact that it was not available as of 31 December 2020. Having considered Mr. Peer's concern that using information available as of this date will not fully account for the effects of the Unbundling Regime, as opposed to information available at 31 December 2021, the Tribunal is satisfied that the effects of the launch of the power exchange in 2022, one-off transactions in Telasi's and Telmico's financial statements, and the OPEX and CAPEX of Telasi and Telmico under the new Unbundling Regime will be adequately covered by the tariff-setting methodology which provides for compensation for differences between actual data and the data used to calculate the tariffs.[36]

62.      In the Tribunal's view, this is the more prudent approach to avoid double compensation, which could result from an award of damages calculated using actual financial data and compensatory tariff increases during the next tariff approval period under the NERC's methodology.

---

[36] See JER4, pp. 11-12, 14-15 and the sources cited by Dr. Moselle. In this regard, the Tribunal believes that it is reasonable to assume that the NERC will properly apply the tariff-setting methodology.

63.    The Tribunal has considered Mr. Peer's objection that Dr. Moselle relies on information that became known after the fact, in breach of international valuation standards. In this regard, Mr. Peer points to Dr. Moselle's use of Telasi's Distribution Tariffs for the period 2H 2021-2025 from the NERC's model from December 2020 instead of the tariffs approved by Resolution No. 83 of 29 December 2020.

64.    Having considered this criticism, the Tribunal accepts Dr. Moselle's explanation that the NERC used its model from December 2020 to calculate Telasi's Distribution Tariffs for the entire period 2021–2025 and that the tariffs in the model are the same as those approved by Resolution No. 83 of 29 December 2020. It appears that the NERC's December 2020 model foresaw that distribution tariffs would be increased in the period 2H 2021–2023 to account for adjustment in the cost of electricity purchases, as reflected in the explanatory notes to Resolution No. 83. Accordingly, it does not appear that Dr. Moselle relied on information that only became available after a valuation date of 31 December 2020. Further, it does not appear that Dr. Moselle relied on NERC Resolution No. 27 of 29 June 2021 but, rather, the tariffs foreseen as of December 2020.

65.    In the Tribunal's view, Dr. Moselle's approach should be preferred since the use of the valuation date of 31 December 2020 is consistent with a calculation of damages accepted by the Tribunal in its previous Partial Awards and avoids complexities and possible biases from the use of different dates and sources of information in the But-For and Actual Scenarios. The Tribunal accepts that the use of a valuation date of 31 December 2021 would require the recalculation of the But-For scenario as of that date. As Dr. Moselle points out, this would likely be a complex and time-consuming task which could give rise to further disagreements between the Experts and require further intervention and decisions by the Tribunal.

66.      The exercise undertaken by the experts to calculate damages for the forecast period from 1 July 2021 to 31 December 2025 is a complex task which is intended to provide the best estimate of damages to Telasi during the period in question. In the Tribunal's view, the use of 31 December 2020 as the valuation date provides a reliable and reasonable estimate of damages which it prefers to the later valuation date espoused by Mr. Peer.

### B.      Disagreement 2: the Components of FCFF

67.      The second disagreement between the Experts relates to the approach for calculating cashflows in the But-For and Actual Scenarios. The issue is whether these cashflows should include all components of FCFF ("**Full FCFF**") or the four specific components of FCFF ("**FCFF Components**") used in this Experts' previous calculations and reports. If the additional components contained in Full FCFF, such as OPEX, CAPEX and net working capital, are included in the calculation, then this increases the amount of damages.

68.      Mr. Peer is of the view that all components of FCFF should be used in the calculation of damages since the business operations of Telasi have been fundamentally altered by the Unbundling Regime. In his view, while the use of specific components affected by the regulatory tariff-setting methodology was adequate, the effect of the regulatory changes under the Unbundling Regime are broader such as to make that approach no longer appropriate.[37]

69.      Dr. Moselle continues to consider only the components of FCFF that he maintains are affected by the change in the methodology for setting tariffs relative to the 2013 Memorandum. These are revenue from the sale of electricity; cost of electricity purchases; the TIA; and the change

---

[37] JER4, p. 16.

in net working capital. In his view, there is no reason to assume that the other components of FCFF would be different between the Actual and But-For scenarios. Therefore, they should have no impact on damages.[38]

### i.    *Mr. Peer's Approach*

70.    Mr. Peer summarizes his approach as follows:

> *The Unbundling Regime has impacted various aspects of Telasi business including a new tariff methodology, business model and physically segregation of Telasi into two new entities. These two entities and components of their FCFF are not comparable to the initial Telasi any longer.*
>
> *To account all differences caused by the Unbundling Regime I have considered all FCFF components in my calculations and identified the following key differences between But-For and Actual scenarios:*
>
> *— OPEX in the Actual scenario is higher due to the segregation of the company into two (e.g. higher personnel expenses);*
>
> *— Net working capital in the Actual scenario impacted by (1) the change of the cost structure, (2) launch of power exchange on 1 March 2022, (3) various one-off transactions and close-out of the previous Telasi debts during the transition to the Unbundling Regime.*
>
> *Initially a component-based approach for calculation of damages was proposed by me in my First Expert Report. Before the Unbundling Regime Telasi had the same business model in the Actual and But-For scenarios and damages were in the majorly [sic] caused by different tariffs. The simplified model was easier to calculate and understand as well as being less prone to error. The Unbundling Regime itself caused additional changes to the business which should not be ignored in calculations. The simplified model is no longer suitable and will result in erroneous calculations if assumptions as to the impact of components are incorrect, such as assuming that certain components of the current tariff setting regime will result in similar compensation as would be received under the 2013 Memorandum.[39]*

71.    Mr. Peer considers that Dr. Moselle's FCFF Components approach could lead to an underestimation of damages. In his view, Dr. Moselle's calculation of Telmico's revenue as a product of volumes and tariff is not adequate since it does not consider various components of the

---

[38] JER4, p. 16.

[39] JER4, pp. 16-17.

cost base such as: OPEX and CAPEX; compensation for working capital; cost of bank guarantees; and other cost components. In Mr. Peer's view, these additional costs which are not applicable in the But-For scenario are compensated via revenue in the Actual Scenario which increase cash inflows. However, according to Mr. Peer, those additional costs are not considered as cash outflows in Dr. Moselle's calculations. As a result, there is an overestimation of cashflows in the Actual Scenario and an underestimation of damages.[40]

72.     Further, according to Mr. Peer, Dr. Moselle's FCFF Components approach does not include detailed calculations of the net working capital in the Actual Scenario. Those calculations only reflect the impact on net working capital caused by the FCFF components he considers (i.e., revenue and cost of electricity). Mr. Peer disagrees with Dr. Moselle's assumptions that Telasi and Telmico would have the same turnover period for accounts receivable and accounts payable in the Actual Scenario as Telasi's turnover period in the But-For scenario. In Mr. Peer's view, the Unbundling Regime affected the business cycles of both Telasi and Telmico. This requires a model which includes a separate calculation for the net working capital and turnover period for the different types of expenses and income. As a result, the FCFF Components approach does not comply with the Tribunal's direction to estimate the effect of the Unbundling Regime.

73.     In response to Dr. Moselle's comments, Mr. Peer maintains that use of the Full FCFF approach would not lead to any double recovery of costs. The use of actual data for 2H 2021 means that any deviations from the NERC's forecasts are reflected in damages. For this reason, Mr. Peer does not agree with Dr. Moselle's view that if the NERC compensates such deviations in the future by way of the tariff, this would lead to double recovery because these deviations are already

---

[40] JER4, p. 17.

compensated by way of damages. According to Mr. Peer, future tariffs in the Actual Scenario will include an additional component for historical deviations which will increase revenue and FCFF.[41]

74.     According to Mr. Peer, his calculations of future tariffs take into account any historical under or over recovery of costs and any under or over performance, which are compensated or withdrawn in accordance with the NERC's methodology. Mr. Peer assumes that the NERC will continue to apply the same methodology into the future. [42]

75.     In addition, Mr. Peer states that both the FCFF Components and Full FCFF approaches should provide the same damages. According to him, in the Third Joint Expert Report, in which he applied Full FCFF and Dr. Moselle continued to apply the FCFF Components approach, the calculation was the same. Differences in the respective analyses now appear because Dr. Moselle incorrectly assumes that the additional components of the Full FCFF have no impact on the calculation of damages.[43]

### ii.     *Dr. Moselle's Approach*

76.     Dr. Moselle summarized his approach as follows:

> *My calculation of damages is based on the differences in the But-For and Actual scenarios in the four components of FCFF that are affected by the change in the methodology for setting Telasi's electricity tariffs, relative to the 2013 Memorandum. These components are:*
>
> *- revenue from the sales and/or distribution of electricity;*
>
> *- cost of electricity purchases;*
>
> *- TIA; and,*

---

[41] JER4, p. 18.

[42] Ibid.

[43] *Ibid.*

Page 37
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

*- change in net working capital.*

*I consider that the approach of using these four FCFF components is appropriate for the calculation of damages because: (i) it simplifies calculations and suffices for the calculation of damages, (ii) it limits the possibility of overcompensation, and (iii) it prevents compensation via damages of concepts that are not related to the dispute. Below I explain in more detail each of these reasons.*

*1.1. My approach simplifies calculations and suffices for the calculation of damages*

*My approach excludes from the calculation of damages those FCFF components that are equal in both But-For and Actual scenarios. As a result, this approach should lead to the same estimate of damages as if one were to include those excluded components. This approach also has the benefit that it simplifies calculations and reduces the need to use forecasts or make assumptions about every component of FCFF. This is the approach that I have followed in the calculations in all my previous reports, as well as in the reports jointly written with Mr Peer.*

*My current calculations exclude FCFF expenditure components such as CAPEX and OPEX, because, just like in previous calculations, I see no reason to assume that they should be different between the But-For and Actual scenarios. I note that, while in previous calculations, Mr Peer has calculated damages on the basis of all components of FCFF, his estimates of damages have been, until now, fully attributable to the four FCFF components that I consider. In other words, in Mr Peer's previous calculations, the excluded FCFF components (i.e., all FCFF components except for the four above) had no effect on damages because they were assumed to be equal in both But-For and Actual scenarios.*[44]

77.    According to Dr. Moselle, the difference in calculation of damages is due, in part, to the fact that Mr. Peer uses different sources of information for the calculation of the But-For scenario (mostly sourced from the NERC's forecasts) and the Actual Scenario (which uses forecasts, sourced from Telasi and Telmico). In his view, the use of different sources in each scenario creates inconsistencies across scenarios and potentially biases the calculation of damages.[45]

78.    In Dr. Moselle's view, the use of actual data for the second-half of 2021 in the Actual Scenario can lead to over recovery of costs since various costs incurred in that period will be recovered in the future by way of the approved tariffs. In this regard, Dr. Moselle notes that Telasi's and Telmico's tariffs (both in the Actual and But-For scenarios) are calculated including

---

[44] JER4, pp. 18-19.

[45] JER4, p. 19.

allowances for OPEX, CAPEX and other expenditures. Therefore, Telasi and Telmico are already recovering by way of their tariffs the expenses that compose the FCFF components that Dr. Moselle does not consider in his calculations. In this regard, Dr. Moselle refers to the potential double compensation relating to additional finance costs to Telmico flowing from the purchase of electricity from the power exchange. According to Dr. Moselle, Mr. Peer's calculation of damages to Telmico includes these additional costs although, according to Telmico's 2021 Financial Statements, these costs will be compensated via tariff increases in the next tariff period.[46]

79.    According to Dr. Moselle, his use of the valuation date of 31 December 2020 prevents the issue of double compensation since as of that date the FCFF components that he excludes from the calculation are equal to each other in both the But-For and Actual scenarios. As a result, the calculation of damages is not affected by the use of the Full FCFF or FCFF Components approach. However, in Mr. Peer's approach using the valuation date of 31 December 2021 the consideration of all FCFF components is likely to lead to over-compensation of costs by way of damages.

80.    In addition, Dr. Moselle refers to the possibility that the use of Full FCFF may include in the calculation of damages items that are not related to the dispute between the Parties and which should be borne by Telasi or Telmico. In this regard, Dr. Moselle refers to Telmico's 2021 Financial Statements which include as an operating expense "fines and penalties", which is included in Mr. Peer's approach as a cost and increases his calculation of damages. In Dr. Moselle's view, taking into account such a component is inappropriate and not in accordance with regulatory practices.[47]

---

[46] JER4, p. 19.

[47] JER4, p. 20.

81.    Dr. Moselle also notes that damages are equal under either the Full FCFF or FCFF Components approach when the valuation date used is 31 December 2020. In his view, if the Tribunal were to accept a valuation date of 31 December 2021 and Mr. Peer's approach, then damages should be recalculated to avoid the issues arising from the use of the inconsistent sources of data, overcompensation and damages concepts unrelated to the dispute.[48]

      *iii.*      ***The Tribunal's Analysis***

82.    For the reasons stated above, the Tribunal has determined that the appropriate valuation date is 31 December 2020. As Dr. Moselle notes, damages are equal under either FCFF approach if the valuation date of 31 December 2020 is used.

83.    In the Experts' previous joint expert reports, the four FCFF components used by Dr. Moselle were the sources of damages and the other FCFF components were assumed to be equal in both But-For and Actual Scenarios. Mr. Peer's most recent calculations use FCFF components which are not equal to each other in the But-For and Actual Scenarios and, therefore, his calculations using Full FCFF differ from Dr. Moselle's using FCFF Components. It appears that Mr. Peer's use of different sources of information for the calculation of the But-For scenario, sourced primarily from the NERC's forecasts, and of the Actual Scenario, sourced primarily from Telasi's and Telmico's forecasts, explains why the excluded FCFF components are not equal to each other in his calculations.[49] According to Dr. Moselle, the use of different sources in each scenario creates inconsistencies between them and potentially biases the calculation of damages.[50]

---

[48] JER4, p. 21.

[49] JER4, p. 19.

[50] JER4, p. 11.

84.    The Tribunal prefers Dr. Moselle's approach which uses the same, consistent sources of information for his calculations. Having determined that the appropriate valuation date is 31 December 2020, this appears to the Tribunal to be the most reliable method of estimating damages.

85.    The Tribunal also accepts that Dr. Moselle's approach is more likely to avoid the possibility of over-compensation which could arise from the use of actual financial data for 2H 2021 since the costs incurred in that period as damages will also be compensated in the future by way of the adjustment of tariffs under the new methodology.[51]

86.    Accordingly, the Tribunal finds that damages for the forecast period should be calculated on the basis of Dr. Moselle's Components FCFF approach.

87.    Accordingly, the Tribunal finds that the compensation due to Telasi for the period from 1 July 2021 to 31 December 2025 is USD 22,640,000.

## VI.    CONCLUSION

88.    For the reasons set out above, the Tribunal concludes that the additional damages owed to Gardabani with respect to the exchange rate adjustments for the period from 1 January 2022 to 31 December 2025 is USD 8,836,000. In the Second Partial Award on Damages, the Tribunal ordered the Respondents to pay Gardabani USD 18,663,000. Taking into account the additional damages determined in this Final Award, the total amount payable by the Respondents to Gardabani is USD 27,499,000.

89.    With respect to Telasi, for the reasons set out above, the Tribunal finds that the compensation owed to Telasi for the Forecast Period from 1 July 2021 to 31 December 2025 is

---

[51] JER4, p. 19. It appears that Telasi and Telmico acknowledge that these costs will be compensated by way of tariff increases in the following tariff period. See JER4, pp. 15, 19 and the sources cited there by Dr. Moselle.

USD 22,640,000. In the Second Partial Award on Damages, the Tribunal ordered the Government of Georgia to pay Telasi USD 61,860,000 on account of damages for the period from 31 March 2013 to 30 June 2021. Taking into account the damages award in this Final Award to Telasi for the Forecast Period from 1 July 2021 to 31 December 2025, the total amount payable by the Government of Georgia to Telasi is USD 84,500,000.

## VII.    INTEREST

90.    Each of the Parties claimed interest on the amounts awarded in their respective claims and counter-claims. The Parties' Quantum Experts took pre-award interest into account in their calculations, without disagreement.[52] Therefore, the relevant issue for determination is post-award interest.

### A.  The Claimants' Position

91.    The Claimants say that the Tribunal should award post-award interest at a reasonable commercial rate.[53] The Claimants maintain that the Tribunal should adopt a post-judgment interest rate similar to that used by the Experts in their calculations in their Joint Expert Reports assessing losses. On that basis, the Claimants say that the appropriate interest rates for 2021 and 2022 are 4.4% and 6.5% respectively.[54]

---

[52] Claimants' Memorial, ¶¶ 324-325; Claimants' Additional Submission on Interest and Costs, dated 5 July 2022, ¶¶ 4-11; Respondents' Submissions on Costs and Interest, dated 5 July 2022 ("Respondents Additional Submissions on Costs and Interest"), ¶ 17. In their Memorial, at ¶ 325, the Claimants stated that since their assessment of losses included interest as of the date of assessment, no separate pre-judgment interest is required.

[53] Claimants' Memorial, ¶¶ 326-328; Claimants' Additional Submission on Interest and Costs, ¶¶ 15-20.

[54] Claimants' Additional Submission on Interest and Costs, ¶17.

92.    Alternatively, the Claimants submit that the Tribunal could award interest at an annual rate equal to the annual average yield to maturity on 5-year dollar-denominated Georgian Government bonds. They say that this would reflect Georgia's borrowing cost, on the basis that by withholding compensation, the Respondents have forced the Claimants to lend those funds to the State. On this basis, the Claimants say that the relevant interest rates are 2.5% for 2021 and 6% for 2022. [55]

93.    In the further alternative, the Claimants say that if the Tribunal does not accept these alternatives, post-judgment interest should be set at the three-month LIBOR rate plus 2%.[56]

94.    The Claimants also say that interest should be compounded on a quarterly basis until payment in full.[57] The Claimants say that compounding on a quarterly basis reflects the commercial uses to which compensation could have been put if it had been paid in a timely manner. According to the Claimants, investment arbitration tribunals often award post-award interest on a compound basis and refer to certain awards in that regard.[58] With respect to the effective date from which interest should accrue, the Claimants say that their losses were assessed as of 31 December 2020. However, the first tranche of damages was awarded later, in the Second Partial Award on Damages, dated 23 November 2021, with the remaining portion to be awarded in the Final Award.

95.    The Claimants say that the Respondents have not paid any part of the compensation awarded to them.[59] Therefore, the interest should accrue from the day after the valuation date,

---

[55] Claimants' Additional Submission on Interest and Costs, ¶18.

[56] Claimants' Additional Submission on Interest and Costs, ¶19.

[57] Claimants' Additional Submission on Interest and Costs, ¶ 20; Claimants' Memorial, ¶¶ 326-328, 337(b); Claimants' Reply, ¶ 270(b).

[58] Claimants' Additional Submission on Interest and Costs, ¶20; Hydro S.r.l. and others v. Republic of Albania (ICSID Case No. ARB/15/28), Award, 24 April 2019, CL-0235, ¶ 885; Crystallex International Corporation v. Bolivarian Republic of Venezuela (ICSID Case No. ARB(AF)/11/2), Award, 4 April 2016, **CL-0024**, ¶ 935.

[59] Claimants' Additional Submission on Interest and Costs, ¶ 13.

1 January 2021. Otherwise, the Claimants say that they would be left with less money than they would have received had the Respondents paid compensation on the valuation date.[60]

96.    With respect to the Respondents' claims for interest, the Claimants say that no such interest is due since these claims were offset against the damages awarded to the Claimants. Since the balance is in favour of the Claimants, no amount is due to the Respondents.[61]

### B.    The Respondents' Position

97.    The Respondents provided submissions on post award interest only, since pre-award interest was taken into account in the Experts' calculations.[62] The Respondents say that any post-award interest at the six-month USD Secured Overnight Financing Rate ("**SOFR**") plus 2% should be adopted as a reasonable commercial arbitration rate for post-award interest.[63] The Respondents say that the Tribunal should apply this rate as of 23 December 2021, the date that the sums awarded in the Second Partial Award on Damages fell due.[64]

98.    The Respondents say that interest should be awarded on a simple basis as there are no special circumstances justifying an award of compound interest in this case. Further, the Respondents say that the award of compound interest is not authorized under Georgian law.[65] According to the Respondents, the award of interest is not, as submitted by the Claimants, to

---

[60] Claimants' Additional Submission on Interest and Costs, ¶ 14.

[61] Claimants' Additional Submission on Interest and Costs, ¶ 22. With respect to pre-award interest, the Claimants say that interest on the Respondents' Counterclaims could not have accrued before 25 November 2018 (the date of the Respondents' Counter-Memorial and Memorial on Counterclaims), since this was the first date on which payment of the TIA was requested. See Claimants' Additional Submission on Interest and Costs, ¶ 23.

[62] Respondents Additional Submissions on Costs and Interest, ¶ 17.

[63] Respondents Additional Submissions on Costs and Interest, ¶¶ 23-24. The Respondents say that since LIBOR is being phased out, arbitral tribunals have found that the SOFR is an appropriate replacement.

[64] Respondents Additional Submissions on Costs and Interest, ¶24.

[65] Respondents Additional Submissions on Costs and Interest, ¶¶ 19-20.

"incentivize" a party to satisfy an award. Rather, it is to provide full compensation and should not have a punitive function.[66] According to the Respondents, absent specific circumstances that would justify awarding compound interest, only simple interest should be awarded.[67] Further, the Respondents say that the Claimants have accepted that compound interest is not authorized under Georgian law and that in these circumstances, simple interest at a reasonable commercial rate is appropriate in this Arbitration.[68]

### C.    The Tribunal's Analysis

99.    In the Tribunal's view, post-award interest should accrue as of 24 December 2021, the day following the date on which sums awarded by the Tribunal in the Second Partial Award on Damages fell due. The Tribunal is not persuaded that post-award interest should run from the assessment date of 31 December 2020, as submitted by the Claimants.

100.    With respect to the applicable rate of interest, the Tribunal finds that in the circumstances of this case, the six-month USD SOFR plus 2% rate proposed by the Respondents is a reasonable commercial rate for post-award interest. The Tribunal is not persuaded that awarding post-award interest in this case on a compound basis would be appropriate since, as the Parties have accepted, Georgian law does not envisage the award of compound interest in the circumstances of this case.[69] Accordingly, interest is awarded on a simple basis.

---

[66] Respondents Additional Submissions on Costs and Interest, ¶ 22.

[67] Respondents Additional Submissions on Costs and Interest, ¶ 26; Respondents' Counter-Memorial, ¶¶ 408-411; Respondents' Rejoinder, ¶¶ 468-471.

[68] Respondents' Submissions on Costs and Interest, ¶ 20; Claimants' Letter to the Tribunal, dated 29 June 2021, p. 3.

[69]  Claimants' Letter of 29 June 2021, p.3; Respondents' Comments on Quantum Issues, dated 21 June 2021, p. 27; Respondents' Submissions on Costs and Interest, ¶20.

# VIII.    COSTS

101.    In this arbitration, the relevant rules on costs are Articles 49 and 50 of the SCC Arbitration Rules. Article 49 provides in relevant part as follows:

> *Article 49 Costs of the Arbitration*
>
> *(1) The Costs of the Arbitration consist of:*
>
> > *(i) the Fees of the Arbitral Tribunal;*
> >
> > *(ii) the Administrative Fee; and*
> >
> > *(iii) the expenses of the Arbitral Tribunal and the SCC.*
>
> *...*
>
> *(6) Unless otherwise agreed by the parties, the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case, each party's contribution to the efficiency and expeditiousness of the arbitration and any other relevant circumstances.*
>
> *Article 50 Costs incurred by a party*
>
> *Unless otherwise agreed by the parties, the Arbitral Tribunal may in the final award, at the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case, each party's contribution to the efficiency and expeditiousness of the arbitration and any other relevant circumstances.*

102.    In their submissions, the Parties also address the applicable rules under the ICSID Convention and ICSID Arbitration Rules. The relevant provisions referred to by the Parties are as follows:

> *ICSID Convention*
>
> *Article 61 (1)*
>
> *(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*
>
> *ICSID Arbitration Rules*

> *Rule 28*
> *Cost of Proceeding*
>
> *(1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:*
>
> > *(a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;*
> >
> > *(b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.*
>
> *(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.*

103.    The Parties agree that the rules governing the award of costs under the SCC Arbitration Rules and the ICSID Convention and Arbitration Rules are similar and provide the Tribunal broad discretion in allocating costs. Although the Parties referred to different aspects of the procedure in both the SCC Arbitration and the ICSID Arbitration, they did not distinguish between the two arbitrations for the purposes of their claims on costs which sought a single award of costs covering both arbitrations.

### A.  The Claimants' Position

104.    The Claimants say that the general basic principle is that costs should follow the event. Therefore, if they are the successful party in the arbitrations, even if only substantially successful, they should be awarded their full costs. The Claimants say that the successful Party should only be denied its costs if it has needlessly prolonged the proceedings or otherwise conducted itself improperly. The Claimants say that they have conducted the arbitration efficiently and acted in good faith. In this regard, they sought to maximize efficiency by agreeing to the consolidation of

the SCC Arbitrations and proposing a method of coordinating the ICSID and SCC Arbitrations. They also say that they advanced their full case from the beginning, thus ensuring a fair opportunity for the Respondents to develop a full defense at the appropriate stages of the arbitration.[70] In response to the Respondents' argument, the Claimants say that the commencement of parallel arbitrations was not an abuse of process and did not unnecessarily complicate or increase the costs of the arbitrations. According to the Claimants, they are distinct legal entities with rights under different instruments. Therefore, they were entitled to pursue a remedy in the forum designated in the relevant instrument: the 2013 Memorandum, the Khrami SPA and the BIT. In order to promote efficiency in time and cost, the Claimants say they agreed to consolidate the SCC Arbitrations and coordinate the SCC and ICSID Arbitrations. They say they were entitled to advance their claims under alternative liability bases and that they should not be denied costs for having commenced parallel claims.[71]

105.    In response to the Respondents' argument, the Claimants say they did not cause unnecessary expense in their conduct of the arbitration by *inter alia*, bringing the Supplemental Claims in the ICSID Arbitration. They say these claims were appropriate and valid.[72]

---

[70] Claimants' Submission on Costs, dated 16 January 2020 ("Claimants' First Submissions on Costs"), ¶ 16.

[71] Claimants' Reply Submission on Costs, dated 30 January 2020 ("Claimants' Reply on Costs"), ¶¶ 7-8.

[72] Claimants' Reply on Costs, ¶¶ 10-11. The Claimants say that their document production requests in respect of the diversion of the Khrami Company's electricity and sales were legitimate and could not have generated significant costs. Further, the Tribunal ordered production in several of these requests and the Respondents agreed to search for and produce documents in relation to a number of items. Although the Claimants did not quantify their claim for the cost of new connections, this represented a breach of Silk Road's rights under the BIT and the fact that it did not lead to a claim for additional damages is irrelevant. With respect to the claim relating to Telasi's Purchase Portfolio Volatility, the Claimants say that the quantum claim is immaterial to the legitimacy of the claim, particularly where it evidenced further breaches of rights under the BIT.

Page 48
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

106.    The Claimants also maintain that their document production requests were proper and consistent with the process agreed in the arbitrations. They say that the fact that the Respondents made fewer document production requests does not demonstrate an abuse of procedural rights.[73]

107.    With respect to the Respondents' claim for costs, the Claimants say that the Respondents should not be awarded costs even if they succeed substantially in the arbitrations. The Claimants allege that the Respondents' conduct was inefficient and uncooperative in a number of respects.[74]

108.    The Claimants also maintain that the Respondents' counterclaims unnecessarily increased the Parties' costs. In this regard, the Claimants say that the Respondents gave no indication that they would be advancing counterclaims in response to the Claimants' Request for Arbitration. In addition, the Claimants say they had to dedicate additional resources to respond to two separate counterclaims that were virtually identical in substance. They also allege that the scope of the Respondents' counterclaims changed drastically between the Counter-Memorial and the Rejoinder.[75]

109.    The Claimants' updated Statement of Costs provides as follows:

---

[73] Claimants' Reply on Costs, ¶¶ 12-15.

[74] Claimants' First Submissions on Costs, ¶¶ 17-21; Claimants' Reply on Costs, ¶¶ 16-17.

[75] Claimants' First Submissions on Costs, ¶¶ 23-25.

**Claimants' Statement of Costs**

| Type of fees and expenses | Details/ Law firm/Expert | Total (in USD) | Total (in €) | Total (in RUB) | Total (in GEL) |
|---|---|---|---|---|---|
| Legal fees and expenses (including VAT where applicable) | Freshfields Bruckhaus Deringer | 8,625,096 | | | |
| | Dentons | 373,315 | | | |
| | DLA Piper | 80,183 | | | |
| Advances on the costs of the Tribunal, ICSID and SCC | ICSID | 450,000 | | | |
| | SCC | 100,000 | 300,000 | | |
| Experts' fees and expenses | Compass Lexecon | 512,466 | | | |
| | KPMG | 572,173 | 650,739 | | |
| | Deloitte | 107,555 | | | |
| Party expenses (including applicable taxes) | Travel and related costs of the witnesses and party representatives | | 3,093 | 3,229,480 | 47,058 |

[76]

## B.    The Respondents' Position

110.    In their initial submissions on costs, the Respondents maintained that as the successful Party, they were entitled to recover of all their costs of the Arbitrations. In this regard, the Respondents submitted that tribunals have applied the principle of "costs follow the event" to

---

[76] Claimants' Additional Submission on Interest and Costs, Appendix A. Footnotes omitted.

award the successful party all or a portion of its costs.[77] Where a claimant prevails on some, but not all, of its claims, the Respondents say that tribunals typically take into account the relative success of the parties' respective claims and defences in allocating costs.[78]

111.    The Respondents argued that should they prevail in the Arbitrations, there is no reason to depart from the principle of costs following the event. The Respondents contested the Claimants' allegations with respect to their response to document production requests, the timing and scope of their expert evidence and their counterclaims.[79] The Respondents also submitted that the Claimants should be ordered to bear at least part of the Respondents' costs, regardless of the outcome of the Arbitrations, because the Claimants caused the dispute to be unnecessarily complex and costly by: commencing three arbitrations against the Respondents; bringing duplicative contract and treaty claims based on the same underlying facts and challenged measures; and purporting to justify the difference between their duplicative contract and treaty claims by bringing a series of meritless treaty claims.[80]

112.    The Respondents also say that the Claimants increased the costs of document production by their overbroad requests for documents to support meritless claims.[81] The Respondents also complained that the Claimants did not present their full case from the beginning, as alleged, but,

---

[77] Respondents' Submission on Costs, dated 16 January 2020 ("Respondents' First Submission on Costs"), ¶¶ 3-6; Respondents' Reply Submission on Costs, dated 30 January 2020 ("Respondents' Reply on Costs"), ¶¶ 2-4.

[78] Respondents' First Submission on Costs, ¶ 7.

[79] Respondents' Reply on Costs, ¶¶ 5-13.

[80] Respondents' Reply on Costs, ¶¶ 14-17.

[81] Respondents' Reply on Costs, ¶ 18.

rather, raised new arguments in Mr. Peer's direct presentation at the hearing, which required the Respondents to request leave to submit additional evidence from Dr. Moselle.[82]

113.    The Respondents also argued that the Claimants' costs are unreasonable. In this regard, they say that the Claimants' decision to bring duplicative contract and treaty claims greatly increased their costs, which the Respondents should not be required to bear. The Respondents also challenged the costs claimed with respect to the expert reports filed by Dr. Abdala and Mr. Delamer for the preparation of three expert reports in respect of the Claimants' very small claim in connection with the volatility of Telasi's purchase portfolio.[83]

114.    The Respondents changed their primary position in their updated submissions on costs in which they maintain that the Parties should each bear their own costs. The Respondents say that irrespective of the Claimants' partial success in the SCC Arbitration, they should not be made to bear the Claimants' costs in the two Arbitrations. In this regard, the Respondents say that the Parties' disputes were caused in part by the unclear wording of the 2013 Memorandum and the difficulty in its interpretation. Further, the Claimants did not prevail on all of their claims while the Respondents' prevailed on their counterclaim.[84]

115.    Further, the Claimants unnecessarily complicated the quantum phase of the SCC Arbitration. After having presented a damages claim in the amount of USD 199.5 million dollars at the hearing, the Claimants maintained a claim for damages amounting to USD 205 million after

---

[82] Respondents' Reply on Costs, ¶ 19.

[83] Respondents' Reply on Costs, ¶ 23. The Respondents say that the Claimants claimed USD 512,466 in expert fees and expenses in respect of a claim for USD 13,000. The Respondents say that the costs in question are unreasonable and should not be born by them irrespective of the Tribunal's findings. The Respondents also challenged the claim for costs incurred by Deloitte, which did not specify how they related to the Arbitrations. The Respondents say that any costs incurred in respect of Deloitte's preparation of Annual Independent Reports on Telasi performance indicators was required under the 2013 Memorandum and would have been incurred by Telasi in any event.

[84] Respondents Additional Submissions on Costs and Interest, ¶¶ 6-9.

Page 52
SCC Arbitration V2018/039; ICSID Case No. ADM/18/1
Final Award – 9 September 2022

the Tribunal had found in the Respondents favour with respect to several issues in the Partial Award on Liability. Therefore, the Claimants' updated damages calculations did not properly take the findings in the Partial Award on Liability, into account.

116.    In addition, the Tribunal found in the Respondents' favour on the great majority of the disputed issues in the First and Second Partial Awards on Damages.[85] The Respondents say that in similar circumstances, arbitral tribunals have held that costs of the proceeding should be shared equally between the parties and that the parties should bear their own legal fees and expenses.[86]

117.    The Respondents also maintain that an equal apportionment of costs is particularly appropriate in the circumstances of these Arbitrations in which the Claimants caused the disputes to be unnecessarily complex and costly. In this regard, the Respondents refer to: the Claimants' commencement of three separate arbitrations against the Respondents and bringing duplicative contract and treaty claims based on the same underlying facts and measures; the Claimants' compelling the Respondents to expend an inordinate amount of time and resources to rebut the Supplemental Claims in the ICSID Arbitration which were largely unsubstantiated by any evidence; and the Claimants' use of document production to fish for non-existent evidence to support their meritless Supplemental Claims.[87]

118.    For these reasons, the Respondents maintain that they should not have to bear any of the Claimants' costs and request that the Tribunal order the costs of the proceedings to be shared equally between the Parties and that each Party bear its own legal fees and other costs.

119.    The Respondents provided an updated Statement of Costs as follows:

---

[85] Respondents Additional Submissions on Costs and Interest, ¶¶ 9-11.

[86] Respondents Additional Submissions on Costs and Interest, ¶ 12 and the sources cited there.

[87] Respondents Additional Submissions on Costs and Interest, ¶ 13.

| Category | Amount as at 31 December 2019 | Additional Amount as at 30 June 2022 | Total |
|---|---|---|---|
| White & Case LLP Legal Fees | USD 6,175,059 | USD 889,983.70 | USD 7,065,042.7 |
| White & Case LLP Expenses | USD 103,865.08 | USD 3,245.63 | USD 107,110.71 |
| Ministry of Justice Costs | GEL 80,577.79 | GEL 17,694.50 | GEL 88,272.29 |
| Dr. Moselle's Fees and Expenses | USD 1,462,244.81 | USD 513,420.6 | USD 1,975,665.41 |
| Prof. Turava's Fees and Expenses | USD 9,000 | / | USD 9,000 |
| Prof. Tercier's Fee and Expenses | EUR 8,880 | / | EUR 8,880 |
| SCC Costs | EUR 42,845 | / | EUR 42,845 |
| ICSID and Tribunal Costs | / | / | To be determined by ICSID in due course |

[88]

## C.    The Tribunal's Analysis

120.    Having carefully reviewed the Parties' submissions on costs and considered their conduct, the outcome of the various disputes addressed in the Partial Award on Liability, the First and Second Partial Awards on Damages and this Final Award in the SCC Arbitration, the Tribunal finds that the Parties should share the costs of the arbitration equally and that each Party should bear its own legal fees and other costs.

121.    In the Tribunal's view, success in this arbitration has been mixed.  While the Claimants have succeeded in obtaining a substantial award, it is significantly less than they claimed. Further,

---

[88] Respondents Additional Submissions on Costs and Interest, ¶16. Footnotes omitted. These costs and expenses are in addition to the Tribunal's fees and expenses, the fees and expenses of Professor Tercier and the administrative charges of ICSID and of SCC. The Respondents reserve their right to update their Statement of Costs should further significant costs be incurred after 30 June 2022, including, for example responding to the Claimants' applications seeking to add certain documents to the record.

the Respondents have been successful in their counterclaim and with respect to a number of contested issues related to the calculation of damages.

122.    With respect to the Parties' conduct of the Arbitrations, they pursued their claims and defences vigorously, but did not exceed the bounds of appropriate, diligent conduct, particularly in light of the complexity of the issues in dispute.  Thus, the Tribunal has determined that the Parties shall share equally the costs of the Arbitration and bear their own legal costs and other expenses.

123.    Pursuant to Article 43 of the SCC Rules and Section 4 of Procedural Order No. 1, the Tribunal requested the Board of the SCC to determine the costs of the arbitration.

124.    On 9 September 2022, the SCC fixed the costs of the arbitration as set out below.  Though the arbitrators' fees were incurred in USD, the SCC has fixed the arbitrators' fees in the EUR equivalent as at the date of this Award.

    a)  For the Tribunal and the Administrative Secretary

- The fee of the President, Mr. Henri Alvarez amounts to EUR 249,600 and compensation for expenses amounts to USD 6,871.06.

- The fee of Arbitrator Professor Stanimir Alexandrov amounts to EUR 93,755 and compensation for expenses amounts to USD 9,013.76.

- The fee of Arbitrator Professor Zachary Douglas amounts to EUR 82,156 and compensation for expenses amounts to USD 3,244.88. =

- Expenses amounting to USD 69,521 for the payment of fees and expenses to the Administrative Secretary Ms. Elsa Sardinha.

        *   *   *

The total of fees and expenses of the arbitrators and the administrative secretary amount to: EUR 425,511 and USD 88,650.70.

b) For the Stockholm Chamber of Commerce

- Administrative fee EUR 60,000.

- Expenses amounting to EUR 17,760 for the payment of fees and expenses to former chairperson Mr. Pierre Tercier in the preceding SCC Arbitration 2017/09.

- Additional expenses amounting to SEK 5,250.25 related to the shipping costs of certified partial awards to the Parties.

\*   \*   \*

The total of fees and expenses of the Stockholm Chamber of Commerce amount to: EUR 77,760 and SEK 5,250.25.

c) For direct expenses

- Hearing expenses amounting to USD 41,300.

- ICSID's annual administrative fee amounting to USD 210,000 in total.

\*   \*   \*

The total of direct expenses amounts to: USD 251,300.

## IX.    CONCLUSION AND ORDERS

125.    For the reasons set out in the Partial Award on Liability, the first Partial Award on Damages, the Second Partial Award on Damages and as set out above in this Final Award, the Tribunal:

a) Declares that the Respondents have breached their obligations under Clause 5.2.2 of the Khrami SPA and Clause 2 of Annex 1 of the Khrami SPA;

b)  Orders the Respondents to pay to Gardabani USD 27,499,000;

c)  Declares that the Government of Georgia has breached its obligations under Clauses 2.2, 2.3 and 5.2 of the 2013 Memorandum;

d)   Orders the Government of Georgia to pay Telasi USD 84,500,000;

e)  Declares that the Government of Georgia is entitled to its fifty percent share of the TIA accumulated by Telasi between 1 April 2013 and 2 September 2015 (which has been taken into account in the calculation of the amount awarded to Telasi in paragraph d), above);

f)  Declares the amounts awarded in paragraphs b) and d) above are awarded on an after-tax basis;

g)  Orders the Respondents to indemnify the Claimants for any taxation liability that may arise in Georgia in relation to the amounts awarded in paragraphs b) and d), above;

h)  Awards the Claimants simple interest on the amounts awarded in paragraphs b) and d), above, at the six-month USD SOFR rate plus 2% from 24 December 2021 until payment in full;

i)  Orders that the Parties shall share equally the costs of the Arbitration detailed in paragraph 124, above, and amounting to EUR 503,271; USD 339,950.70; and SEK 5,250.25 and bear their own legal costs and other expenses.

126.    A Party may apply to amend the Award regarding the decision on the fees of the arbitrators. Such application should be filed with the district court within whose jurisdiction the arbitration had its seat within three months from the date when the Party received this Award.

**Place of Arbitration: Stockholm, Sweden**


_____          **9 September 2022**
                                         _____
**Professor Stanimir Alexandrov**         **Date**
Arbitrator


_____          **9 September 2022**
                                         _____
**Professor Zachary Douglas QC**          **Date**
Arbitrator
*Subject to the partial dissenting opinion*
*appended to the Partial Award on Liability*


_____          **9 September 2022**
                                         _____
**Mr. Henri Alvarez QC**                  **Date**
President